AGNES M. STARR et al.

*v.*

DAVID WILEY, trustee, &c.

[Submitted March 19th, 1918. Decided April 16th, 1918.]

1. A trustee will not be removed for discord existing between him and the *cestuis que trust,* unless it arose out of his behavior.

2. Where the funds of a trust estate are liable to be jeopardized, the remedy is to require the trustee to give a bond.

3. On bill for removing a testamentary trustee where the filing of an account was delayed for seventeen years, and therefore the life tenants were delayed in the enjoyment of their interests, this complaint is without merit where all parties were familiar with the situation and were satisfied and acquiescent.

4. Such trustee was not blamable for loaning trust funds without statutory security where the loans were in fact secured and where he had staked his personal fortune to avert the bankruptcy of the venture on which depended the integrity of the complainants' trust fund.

5. The charge that the trustee took excessive commissions was not open to question where his compensation was annually fixed and allowed by the orphans court upon the state of facts disclosed by the accounts, and of which the court and the parties were fully apprised.

6. That the trustee failed to obtain interest on his bank balances did not show lack of diligence where the bank, in which the estate was a stockholder, did not allow interest on deposits; and if there was any lack of diligence in this respect, it should have been brought to the attention of the orphans court on exceptions to the trustee's annual accounts.

---

On bill, &c.

*Mr. Joseph Beck Tyler* and *Mr. Walter L. Sheppard,* for the complainants.

*Mr. Thomas G. Hilliard* and *Mr. J. Forman Sinnickson,* for the defendant.

BACKES, V.· C.

The object of this bill is to remove a testamentary trustee. Josiah Morris died in 1891, and by his will, admitted to probate by the surrogate of Salem county, appointed the defendant, Dr. David Wiley, as executor thereof and trustee thereunder. The personal estate amounted to upwards of a half million dollars; there was also some real estate. By the will a fund of $75,000 was set aside in trust for his widow for life, and the remainder of the personal estate was bequeathed to the testator's two sons, William McK. and Edwin J. Morris, and his three daughters, Mrs. Agnes M. Starr, Mrs. Josephine E. Carter and Miss Bessie L. Morris, in equal shares. The real estate was devised in trust, to pay one-third of the net income to the widow for life and the remaining two-thirds equally to the five children. Upon a sale by the trustee, with the consent of the life tenants, one-third of the proceeds was to be added to the widow's fund and the remainder divided among the children equally. Upon the death of the widow, her trust fund was to be divided equally among the five children. The shares of the two sons were given outright. Those of the daughters were given in trust for life, with remainder to their issue, and in default of issue to the surviving brothers and sisters, in trust to the sisters for life. The executor filed an inventory of the estate shortly after he qualified, and at the expiration of a year, in 1892, he filed his account, at which time he made distribution of the estate, and entered upon the discharge of his duties as trustee. Miss Bessie L. Morris died in 1898, whereupon her share of the trust estate was divided. The widow died in 1914, and a division was made of her fund. The estate held in trust for Mrs. Starr and Mrs. Carter now amounts to over $250,000, made up of fifty-seven bonds and mortgages, three items of corporate stock and a small sum in

cash. Neither of them has issue living, and the two brothers will, in all probability, succeed to the estate, if they survive. Mrs. Carter has been incompetent for many years, and in 1912 her brother William McK. Morris and Charles E. Hyatt, two of the complainants, were appointed guardians of her person and property. The *cestuis que trust* seek the removal of the trustee, and the gravamen of their complaint is that the trustee's misbehavior has created distrust and has resulted in such a condition of mutual antagonism as to render him unfit to further properly discharge the duties of his office, and in support of the right to remove they invoke the doctrine laid down in *May* v. *May, 167 U. S. 310,* and quoted and applied by Vice-Chancellor Stevens in *Lister* v. *Weeks, 60 N. J. Eq. 215 (228),* as follows: " 'The power of a court of equity to remove a trustee, and to substitute another in his place, is incidental to its paramount duty to see that trusts are properly executed; and may properly be exercised whenever such a state of mutual ill-feeling, growing out of his behavior, exists between the trustees, or between the trustee in question and the beneficiaries, that his continuance in office would be detrimental to the execution of the trust, even if for no other reason than that human infirmity would prevent the co-trustees or the beneficiaries from working in harmony with him, and although charges of misconduct against him are either not made out or are greatly exaggerated.' Of course, friction or hostility between trustee and beneficiaries is not of itself a reason for the removal of the trustee; but where that hostility has arisen out of the misbehavior of the trustee it may be. Trustees exist for the benefit of those to whom the creator of the trust has given the trust estate. *Letterstedt* v. *Broers, 9 App. Cas. 386."*

By way of a foreword to the discussion of the specific acts of misconduct alleged against the trustee, it is just to say that the testator's confidence in him was well reposed and has been sacredly observed, and that he has judiciously and with praisable fidelity managed the estate and scrupulously accounted for its yield. Dr. Wiley has been a lifelong resident of Salem; is a physician of high standing and a gentleman of impeccable character and of enviable reputation, and it is regrettable that his

honor and integrity should have been assailed by ill-considered and extravagant charges of malfeasance, none of which finds support in the evidence.

That there is bitter feeling on the part of some of the complainants towards the trustee cannot be denied, and it also cannot be denied that it is not reciprocated on his part. It is also quite apparent that this ill-will has its origin in perfectly upright, but misinterpreted, conduct of the trustee in matters wholly foreign to the trust; and that loss of faith in the trustee, based on his alleged misconduct, is more simulated than real. Some of the history of this family quarrel is necessary. The two brothers, William McK. and Edwin J. Morris, are cotton-duck manufacturers, under the name of Morris & Company, at Groveville, Mercer county, and have been since 1882. They neither harmonized nor did they prosper. In 1908 they were in desperate financial straits and the breach between the two had widened considerably. At that time the trustee held a mortgage on their plant of $50,000, with some $20,000 of accumulated interest, and was also a creditor, personally and as trustee, for more than $30,000. It was in his power to close out their business, and to him William McK. appealed to remove Edwin J. from the co-management and to place him in absolute control. To this Dr. Wiley turned a deaf ear, because, as he said to William: "No, he is your brother and I won't get in between brothers; you wouldn't like it;" and this after William had sought to prejudice him against his brother by repeating uncomplimentary remarks alleged to have been made by the latter concerning the doctor. The sincerity of the trustee's neutrality, and his honesty of purpose, it seems to me, cannot be mistaken, although William unreasoningly chose to misinterpret the decision as a reflection upon his capacity to rescue the firm and as a decided leaning of the trustee towards his brother; and this sentiment he fostered in his sister Mrs. Starr, who also was not well disposed towards Edwin. William's self-appraisal, that he was the better man of the two to handle the business, may have been unexceptionable and he probably acted entirely unselfishly, but it was unfair and inconsiderate of him to accuse the trustee of favoritism for his refusal to do that which he would not have

wanted him to do for his brother. The prudence and wisdom of the trustee's course is not arguable, for had he acceded to the request he would have simply shifted the source of accusations and probably intensified them. However, two years later, by arrangement, William succeeded to the management, and has ever since carried on the business alone, and with success, as I understand. In connection with their cotton duck manufactory Morris & Company conducted another trade under the name Hussong Dyeing Machine Company, a corporation, in which the brothers owned an equal number of shares and Hussong held the balance of power, he owning one-fifth of the issue. In August of 1911, Edwin purchased Hussong's interest without the knowledge of William. Dr. Wiley loaned him part of the purchase price, with the understanding that his brother was to have one-half, and which in fact was later turned over to him. Dr. Wiley acted in the utmost good faith, his single motive being to help the brothers to the absolute control of a very profitable business. Upon learning of the purchase, the suspicion of favoritism became a conviction, and without stopping to inquire into and investigate the real situation, Mrs. Starr and William accused the doctor of unfairness, William declaring to him: "Doctor, you are going to regret that; you will probably regret that the longest day you live." Whether this was a threat or a prophesy, is not clear, but if the latter, William certainly peered into the future with the eyes of a seer, for ever since that time the doctor has experienced round after round of litigation. William, who was treasurer of the Hussong company, refused to transfer the stock on the books of the company until decreed to do so on a bill filed by Edwin March 8th, 1912. *Docket 34 p. 570.* On October 13th, 1913, William brought suit for a dissolution, and a receiver was appointed for the co-partnership, which was eventually settled by incorporating the business, each partner taking a half interest, with the exception of one share issued to a pacificator. *Docket 37 p. 95.* And by way of complement to this suit, on October 18th, 1913, Edwin caused the Hussong company to sue William and Morris & Company for an accounting for the unlawful conversion of its funds, and this also was settled out of court. *Docket 37 p. 113.* In all of these, Dr.

Wiley was vitally interested, because of his heavy trust investments in the firm's plant. Then the complainant Agnes M. Starr filed a bill on November 12th, 1913, to remove him as trustee, which was dismissed February 20th of the following year. *Docket 37 p. 188.* Proceedings were next taken by her in the orphans court to restate an account filed by the executor in 1909, supplemental to the one of 1892, and of which more will be said hereafter, and after protracted litigation the court refused to disturb it on the ground that it truly stated all charges and discharges. This was affirmed by the prerogative court. *Morris Estate, 97 Atl. Rep. 284.* The present bill was filed July 25th, 1916. Meanwhile, exceptions were taken to the trustee's account filed in the orphans court August 30th, 1916, and after a most elaborate and searching examination of the accountant, the court overruled the exceptions, which was affirmed by the prerogative court. *Morris Estate,* February 26th, 1918. For more than twenty years the trustee had annually accounted in the orphans court and always satisfactorily to all concerned, and it was not until William and his sister Mrs. Starr conceived the false idea that Dr. Wiley was partial to one brother to the prejudice of the other, that criticism of them was made, and then, unfortunately, they determined upon a policy of retaliation. Dr. Wiley has defended the attacks calmly and with a patience born of a•resolve to correct the views his cousins entertain of him, confident that their better judgment will finally prevail and that they will become reconciled. He seems pained and distressed over their lack of confidence, rather than resentful.

I will now proceed to a discussion of the various acts of alleged misconduct which, it is contended, eventuated in absolute distrust; and in considering these, it is well to bear in mind that the moving spirit in this litigation is William McK. Morris, guardian, flanked by his sister Mrs. Starr.

1. I will first take up those that centre in the supplemental executor's account filed in 1909. In this account the executor charged himself with $67,009.61, moneys which came to his hands since the filing of the original account in 1892, when a distribution of the estate was made. Of this sum, $49,775.27 represents the proceeds of the sale of what is known as the Wil-

mington property, sold in 1906-08, and the accumulation of interest thereon; $9,404.85 represents the principal, and accumulated interest from 1899 to 1909, on the Empson-Atkinson, now known as the Mary A. Wetherby, mortgage; and $5,919.79, the principal and accumulated interest from 1893 to 1909, on the Samuel Oliphant, herein known as the Robert Porch, mortgage; and the balance of $1,909.70 is made up of thirteen items, one, the proceeds of a small piece of real estate, and the accumulated interest on the purchase-money mortgage from 1893 to 1905, and the others, collections of accounts either not included in the inventory or charged off as doubtful in the original account. The Atkinson-Wetherby mortgage and the Oliphant-Porch mortgage were also charged off in the original account as doubtful.

One grievance is that in deferring the filing of the account for seventeen years, the life tenants were delayed in the enjoyment of the interest. In other words, accounts should have been filed oftener and distributions made earlier. An accounting of the Wilmington properties was delayed, seemingly for two reasons: The larger piece was sold for $38,000, in payment of which a purchase-money mortgage of $32,000 had to be taken, which was reduced in June of 1907 to $19,500; and the remainder was in litigation until October, 1908. Whatever the cause, all parties were familiar with the situation, satisfied and acquiescent. Now, as to the Oliphant-Porch and the Atkinson-Wetherby mortgages: When the distribution of the estate was made in 1892 they were cast aside as unfit for payment of the legacies, because of their questionable value, and were deducted from and allowed in the account. The trustee foreclosed them, bought in the properties and sold them, taking purchase-money mortgages, for the full amount on the Wetherby property and on the Porch property, less a cash payment of $500. The securities were scant and the payments of interest slow, and, as the trustee says, he had to "nurse them along;" so much so, that when Mrs. Wetherby was two years in arrears with her interest, and was threatened with execution on a $1,000 judgment, he advanced her an additional $3,200 to liquidate the interest and to pay off the judgment. taking a third mortgage, which, however, included

other property for which she had paid $4,700. This latter transaction is also brought forth as a cause of complaint, notwithstanding that the third mortgage has since been paid off, and that instead of suffering a heavy loss, the trust estate has a marketable $10,000 mortgage lien on property now worth sixteen to eighteen thousand. By the same careful treatment, the Oliphant-Porch mortgage has become marketable. The other moneys came in dribs and were used by the executor to defray current expenses of the estate unadministered, and debts which were overlooked in the 1892 account, as, for instance, the cost of the monument, which the executor personally advanced, and it was not until 1899 that the receipts equaled the disbursements. After that the accumulation of the bits was made to earn, and every penny of principal and interest was accounted for in the supplemental account of 1909. Miss Bessie Morris died before there was any income available for distribution out of this additional estate, and, consequently, the contention that she was affected by the delay fails. The other life tenants reaped the increments of the delay, without thought of complaint on that score, and their outcry at this late day is somewhat tardy.

Another reason for discontent is that the executor withheld knowledge of the funds. Dr. Wiley gave no intimation of his solicitude and thrift until shortly before the account was filed, and it came to the beneficiaries as an agreeable surprise. Mrs. Starr says she was delighted. Four years later, it would seem she fancied ulterior motives and suffered a loss of faith. Without passing judgment upon her sincerity, it is sufficient to observe that the circumstances should have suggested the utmost rectitude and strengthened her confidence, for the windfall could have been easily "sunk without trace." Albeit, the account has been submitted to judicial scrutiny twice and found to be unimpeachable, and all concerned received their just dues years ago, and with seeming gratification.

Fault is also found with the form of the account. It is not unlike the trustee's annual account, with the frame of which there never was a quarrel; it was intelligible to the orphans court, which approved it, and it was understood by counsel, who examined upon it intelligently, and it certainly is as under-

standable as are those of professional accountants to the average layman, and while principal and interest were mingled, they were properly adjusted in the distribution.

It is finally asserted that the trustee refused to permit a vouching of his accounts, and it is argued that he thereby confirmed Mrs. Starr's and William's suspicions of guilt. The assertion tells but half the story and weakens the argument proportionately It was not until after the two had determined upon strife, and indicated their intention to make things unpleasant, that he was called upon to submit his stewardship of twenty-two years to private audit. Two sets of accountants, retained by the complainants, had investigated, and when the third put in an appearance he was refused on the advice of counsel, and, I think, rightly. The trustee was not obliged to furnish ammunition to the complainants with which to distress himself, and if they were entitled to a vouching the law afforded the remedy through its courts, where also the interest of the trustee would have been safeguarded. It is proper in this connection to speak of the transaction relating to the Sharp mortgage, which Mrs. Starr says first aroused her suspicion, and an item of $240 that appeared in the supplemental account as dividend received from the stock of a military academy, which she says added to her anxiety. The mortgage was part of the daughters' trust estate. In 1903 the United States government took the land in condemnation proceedings, and, through some mishap, the trustee failed to file his claim, and it became foreclosed. After diligent, but unsuccessful, efforts to collect the amount from the government, the executor reimbursed the estate in full in 1914. In the meanwhile the interest had been dropped from the annual accounts, which was noted by Mrs. Starr, who from time to time made inquiry and to whom the situation was fully explained. I fail to see how this occurrence could have created doubt as to the trustee's probity. The incident, and her protest in two other instances, where aged and impecunious mortgagors were in arrears, however, show Mrs. Starr's thorough familiarity with the estate and how keenly she scrutinized the accounts. And so with the dividend on the academy stock. The academy was a family institution of the Hyatt's, cousins of the

Morrises. Many years ago the testator bought eight shares for $2,000, but whether he ever had a certificate is not known, and they were not listed among the securities in the inventory of the estate. In December of 1904, the executor received a check for $240, as dividends, with which he charged himself in the supplemental account of 1909. Why Mrs. Starr should pick out this item from other and much larger items of income, as having aroused her suspicion that there might be other moneys unaccounted for, is inexplicable, and her assertion that it did, is incredible. The utter inconsistency of her after-attitude in relation to this stock, and her bent upon fault-finding, appear by her further complaint that when the beneficiaries were later disposed to hand the stock over to the Hyatts as a gift, it being regarded as worthless, the executor refused until the beneficiaries agreed to be charged with the full value. This she claims was oppressive, but, upon reflection, in view of the contingency of the remainder, she must acknowledge that the executor only discharged his duty, and that had he complied he might have been liable to a charge of waste.

2. The trustee is censured for loaning trust funds to Morris & Company without statutory security. In 1896 he loaned them $2,500, and in 1903 he made further advances, bringing their indebtedness up to $16,000. In 1904 he personally endorsed three notes for $5,000 each, and had them discounted at his bank. When distribution was made under the supplemental account, in 1909, the debt and notes were reduced to $10,000 plus, and in 1914, upon the death of the widow and the distribution of her trust estate, the balance was paid, the large arrearages of interest on the $50,000 mortgage were settled, and the principal was reduced to $36,550. When the first loan was made, Morris & Company had suffered severe financial reverses, and they were sadly in need of even that small sum. In 1903 and 1904 they were on the verge of bankruptcy, and had it not been for Dr. Wiley's good offices at that time they would have collapsed. He staked his personal fortune to save them, and in this he was not single-purposed, for upon this venture depended the integrity of the complainant's trust fund. The mill property at Groveville was precarious security for the $50,000 mortgage, and the ac-

cumulation of more than $20,000 of interest held by the estate, originally invested by the testator, and had the firm failed the shrinkage in value, undoubtedly, would have resulted in great loss. For such generosity, it is painful to witness ingratitude and reproach. The advancement of the trust funds in 1903 was replaced in 1906, after Mrs. Starr mildly protested, with moneys from the widow's trust estate, and there the incident came to an end. Whenever thereafter there were available funds of the latter trust, or of the estate unadministered, the trustee used them to redeem the notes under discount in bank, so that possibly the whole indebtedness was at some time held by either one or the other, or both, but at no time was there danger of loss, because the doctor was accountable, for he was a man of considerable fortune, which was well known to the complainants. Furthermore, it is not correct to say that these loans were unsecured, because it appears that the debtors were vested remaindermen of the widow's estate, and contingently so of that of the daughters, and also were owners in fee of one-half of the testator's real estate.

3. The next stricture involves matters of moral turpitude, in that it charges the trustee with practicing usury. When Dr. Wiley endorsed Morris & Company's notes and had them discounted in 1904, they were paying a rate of twelve per cent. on their invoices payable. To better their credit in this direction, and to save three per cent., they induced him to make the endorsements and offered and urged upon him a rate of nine per cent. interest, which he at first declined to entertain, but they were persistent, and with the notes and renewals sent checks for the discount at that rate, of which, as to the excess, he kept a careful record. He retained the excess, reasoning, as he says, that if a crash came he could use it as salvage. That this was his only motive, is incontrovertible, for it appears that when the debt was reduced to $10,000 in 1909, he tendered them a check for the amount, which William indignantly rejected; and when, in 1914, the balance of the debt was paid, William still resisted, and it was forced upon him only by the doctor's insistence upon using it as a credit on a note of the Hussong company. The insinuation, in the argument, of moral obliquity, is without the slightest justification.

4. Another charge of malfeasance is that the trustee took excessive commissions. The compensations were annually fixed and allowed by the orphans court upon a state of facts disclosed by the accounts and of which the court and parties were fully apprised, and are not open to question here. The circumstances under which they were allowed are disclosed in the opinion in the prerogative court. *In re Morris Estate,* February 26th, 1918.

5. The defendant is also accused of nepotism. The trust estate of the widow held a mortgage on property known as the Kean Farm, which was foreclosed. Upon a sale, the trustee became the purchaser in 1901. He managed the farm for that estate until its termination, in 1914, when he sold it to his brother for $10,000. There is no testimony to show that it was worth more; on the contrary, it appears that that sum was $1,000 more than any other person would offer. It is not shown otherwise than that the sale was made in good faith, and at a time when it was necessary to convert it into cash for the purpose of distributing the widow's estate.

6. The remaining dereliction alleged is that the trustee failed to obtain interest on his bank balances. The Salem National Bank, in which he always kept his account, and in which the estate is a stockholder, never allowed interest upon deposits. For two years he negotiated, without promise, and then in June of 1917 he changed the depository to another where interest is paid. In the circumstances, there was no lack of diligence, and, besides, if there were any shortcoming in this respect, it should have been brought to the attention of the orphans court on exceptions to the annual accounts.

I have reviewed the testimony at greater length than was, perhaps, necessary for the decision, but have done so purposely, to point out that the alienation of confidence, to whatever extent, was due to unfounded obsessions of the complainants, and that the defection and unhappy estrangement were not of the defendant's making, and are not to his liking. The case does not come within the principles quoted in the forepart of these conclusions, and the trustee will not be removed. If I had any apprehension that the funds of the estate would be in danger during his con-

tinuance in office, he would be required to give a bond. *Holcomb v. Coryell, 12 N. J. Eq. 289; Pfefferle v. Herr, 75 N. J. Eq. 219.* And, as it appears that the trustee has accounted for all property chargeable to him, the prayer for a further accounting will be denied and the bill dismissed, with costs.