Complainant John McAllister is a son of Richard McAllister, deceased, under whose will John enjoys the income of a *Page 409 
$100,000 trust fund. Defendants are the trustees named in decedent's will and codicil thereto annexed. One of these trustees is Richard McAllister, an older brother of John and a son of the decedent. The other trustees are John Casey, a brother-in-law of John and Richard, and the Provident Life and Trust Company of Philadelphia, Pennsylvania.
In setting up John's trust estate the trustees took as an investment a first mortgage in the sum of $100,000 on premises situate in Atlantic City. This mortgage was executed by Richard McAllister and his mother on the lands therein described, bears interest at the rate of six per centum per annum and is dated January, 1928. The mortgagees therein named are Richard McAllister, John Casey and the Provident Life and Trust Company, "trustees for John McAllister, under the last will and testament of Richard McAllister, deceased."
The trustees paid John his annual income regularly up until April of 1935, when they withheld further payments for reasons which will hereafter appear. Upon the cessation of income payments John and his wife filed this bill of complaint against the trustees, wherein they pray (1) that this court take jurisdiction of the accounts of the trustees and the administration of the trust estate and compel the trustees to account; (2) that it be adjudged and decreed that the investment by the trustees of "all the funds constituting the corpus of that trust in one mortgage * * * was not justified under the will or codicil * * * or by law; was imprudent and improper and not such an investment as trustees should make," and that the retention thereof, after the trustees knew "that the mortgaged premises were not producing revenue sufficient to pay the interest on said mortgage, was improper and unreasonable and that in making and retaining such investment each and all of said trustees were negligent and derelict in their duty as trustees and guilty of a breach of trust;" (3) that the said trustees * * * be jointly and severally surcharged the sum of $100,000, with appropriate interest, forfeit all commissions and be removed as trustees." *Page 410 
The points relied on by complainants are argued under several heads: (1) "The investment was invalid from the beginning because Richard McAllister, one of the trustees, is one of the obligors, mortgagors, and owns an undivided interest in the property covered by the mortgage."
The provisions of the will with reference to the trust in favor of John reads as follows:
"Third: I give, devise and bequeath unto my Trustees, hereinafter named, One Hundred Thousand Dollars ($100,000) in trust, to invest and reinvest the same, and to pay the net income therefrom, quarter annually, or at such other time or times as my said Trustees may, in their discretion, determine, unto my son, John McAllister, for and during the term of his life and immediately upon his death to pay said income quarter annually, or at such other times as my trustees, in their discretion, may determine, unto the widow and the children of my said son, John McAllister, living at the time of his death, in equal shares.
"If my said son, John McAllister shall leave surviving him a widow with no children, the entire income shall be paid to her for life; if there be one child surviving him and no widow, the entire income shall be paid to such child for life; if he leave surviving him a widow and one or more children, or no widow, and two or more children, the entire income shall be paid in equal shares to the widow and children, or if no widow, to the children surviving him, and the survivors of them.
"Upon the death of my said son, John McAllister, and upon the death of his surviving widow, if any, and the death of his child or children, or the survivors of them, if any, the Trust herein created shall come to an end and the said principal of the trust, together with any accruing interest, shall thereupon, immediately, become a part of and pass with my residuary estate."
There were three additional trusts created by the testator, each in substantially the same phraseology and each creating life estates for the life of the beneficiary, with remainders over, and upon termination thereof, the residue to go to testator's residuary estate. Richard McAllister and his mother are the residuary legatees named in the will.
Title to the mortgaged premises, at the time of the death of Richard McAllister, Sr., was, as to an undivided one-half thereof, in one John L. Kelly, and the other half in decedent. After his father's death and before setting up John's trust estate, Richard purchased the Kelly one-half interest, so that, *Page 411 
at the time of the execution of the mortgage, Richard owned one-half by purchase, one-quarter as residuary legatee of his father's estate, and his mother owned a one-quarter interest, also as residuary legatee. After the execution of the mortgage, it was duly recorded and thereafter a deed from Richard and his mother to the McAllister Realty Company was recorded and this company subsequently conveyed to the McAllister Coal Company, so that it is now the owner of the equity of redemption in the mortgaged premises. Richard McAllister is the largest stockholder of the McAllister Coal Company.
I am not now concerned with whether or not the trustees could have used other assets of decedent's estate for the purpose of setting up John's trust estate, but solely with the question as to whether, having accepted the bond and mortgage given by Richard as mortgagor and obligor to Richard, et al., as trustees, the transaction may be permitted to stand.
There is no rule of law any better settled than that the duty of the trustee is to administer the trust committed to his care solely in the interest of the beneficiary and that he be not permitted to place himself in a position where it would be for his own benefit to violate his duty to the beneficiary or, as stated by Professor Pomeroy in 2 Pom. Eq. Jur. (4th ed.) § 958:
"The policy of equity is to remove every possible temptation from the trustee."
In Mulford v. Bowen, 9 N.J. Eq. 797, Chief-Justice Green said (at p. 798):
"The well settled rule in equity, that an executor, administrator, guardian, or trustee cannot directly or indirectly become a purchaser at his own sale, has not been called in question. * * * It is essential to guard at once the trustee from temptation, and the cestui que trust from the consequences of fraud and injustice."
This case has been followed, without exception, throughout the reports since the time of its decision. See Holcomb v.Holcomb's Ex'rs, 11 N.J. Eq. 281; Staats v. Bergen, 17 N.J. Eq. 554; Shanley v. Fidelity Union Trust Co., 108 N.J. Eq. 564,
in which latter case Vice-Chancellor Backes said: *Page 412 
"Our trustee is not possessed of an independent and impartial judgment as to the advisability of selling the stock, and, if it be advisable, at what price. A half dozen or more members of its board of directors are directors of the Public Service Company. They represent both buyer and seller. As stockholders of the Public Service Company they have a pecuniary interest in the sale. It may be slight but that is unimportant. They are our trustee and the law demands of trustees the utmost fidelity. It does not tolerate personal dealing with the trust estate nor permit the making of a penny's profit. The rule is grounded in sound morals and is reflected in the supplicating words of the Lord's prayer, `lead us not into temptation.' This is not an imputation upon the motives of the directorate of our trustee, but a simple statement of an elemental doctrine of the obligations of trustees. * * * A trustee cannot serve twomasters, with sharply conflicting interests, equally well. It has been tried before. It cannot be done."
Under the evidence in this case, the court does not have to speculate as to how Richard's interest as mortgagor might conflict with his interest as trustee. Answers to interrogatories submitted to defendants show that rental receipts from mortgaged property have not in any way, since the inception of the mortgage, been sufficient to pay taxes, interest and other charges, and that the owner of the equity of redemption has been compelled to make up the deficiency; that Richard, in August of 1935, had applied to his co-trustees for a reduction of mortgage interest from six per cent. to four per cent., as follows:
"We have recently received a letter from Mr. Richard McAllister, Jr., stating that owing to existing business conditions he is asking for a reduction to 4% on interest rate, to be made retroactive in respect to interest due January 3rd. He further states he has been making up the deficit in carrying charges from other monies, but he has reached the point where he cannot continue and unless the concession is granted, states we can proceed with foreclosure."
The above letter was addressed by Richard's co-trustees to the solicitor of the complainant at a time when the interest *Page 413 
due on January 3d 1935, was in default and at a time when it was necessary for all of the trustees to determine whether or not foreclosure should be resorted to.
Assuming Richard and his co-trustees had decided or hereafter decide to foreclose the mortgage given by Richard to the trustees and there is a deficiency, then Richard and his co-trustees must also bring suit against Richard, the obligor, or else decide not to do so. It would seem to be unnecessary to further point out the inconsistency of the dual position occupied by Richard with reference to the trust in favor of John. He has a selfish interest, of course, and
"the principle that the trustee should exclude all selfish interest in his administration of the trust and maintain undivided loyalty to the cestui applies to investments as well as other trust transactions. Lending trust funds to himself obviously violates this rule, as does the purchase of securities from himself." 3 Bogert on Trusts and Trustees 1947 § 612.
But it is said that even if it be true that the trustees had no right to use the bond and mortgage in setting up the trust in favor of John that he, John, is estopped from complaining because he consented thereto.
The law is clear, as set forth by Professor Pomeroy in 2 Pom.Eq. Jur. 2052 § 958:
"If the trustee can show, by unimpeachable and convincing evidence, that the beneficiary, being sui juris, had full information and complete understanding of all the facts concerning the property and the transaction itself, and the person with whom he was dealing, and gave a perfectly free consent, and that the price paid was fair and adequate, and that he made to the beneficiary a perfectly honest and complete disclosure of all the knowledge or information concerning the property possessed by himself, or which he might, with reasonable diligence, have possessed, and that he has obtained no undue or inequitable advantage, and especially if it appears that the beneficiary acted in the transaction upon the independent information and advice of some intelligent third person, competent to give such advice, then the transaction will be sustained by a court of equity."
In the case of White v. Sherman, 168 Ill. 589;48 N.E. Rep. 128 (at p. 132), the court said:
"In order to bind a cestui que trust by acquiescence in a breach of trust by the trustee, it must appear that the cestui *Page 414 que trust knew all the facts, and was apprised of his legalrights, and was under no disability to assert them. Such proofmust be full and satisfactory. The cestui que trust must be shown, in such case, to have acted freely, deliberately, and advisedly with the intention of confirming a transaction whichhe knew, or might or ought, with reasonable or proper diligence,to have known, to be impeachable. His acquiescence amounts to nothing if his right to impeach is concealed from him, or if a free disclosure is not made to him of every circumstance which is material for him to know. He cannot be held to have recognized the validity of a particular investment unless the question as to such validity appears to have come before him."
The only evidence upon which this court could base a finding of estoppel against John by reason of his acquiescence in the investment under discussion is that of Richard McAllister, who says that he discussed the matter with John. "A. I talked with each one and told them that there were certain trust funds in the amounts to be set up and I asked them if this property, relating to John would be perfectly satisfactory, described to him what it was, he said, `yes, that is all right.' He was perfectly satisfied and at no time * * *. Q. You say you described to him, what was it you said to John, as you can recall and what was it he said? A. As near as I can recall * * * I told him that the property was located at Bellevue and Atlantic and gave him the frontage and depth and told him what was there and the income. He said, `that is all right. I am perfectly satisfied.'Q. You said that you had a talk with your brother John about this trust more or less about the time that it was set up, is that correct? A. That is correct. Q. Just when was that talk? A. Well, it was just shortly after father died. Q. Where did it take place? A. 25 South New Jersey avenue, I went up there. Mr. Lord called my attention to the fact, he said, `you have got to take up and talk to each one and tell them what it is and whether it is agreeable to them,' which I did and they said it was perfectly agreeable."
Richard does not say that he told John that he, Richard, *Page 415 
together with his mother, were the obligors on the bond and the mortgagors named in the mortgage, nor did he explain to John that in the event of default being made that he, Richard, together with his co-trustees, would pass on the question as to whether foreclosure proceedings should be instituted, nor did he call to John's attention the possibility that there would be a deficiency on a foreclosure sale and that he, together with his co-trustees, would have to determine whether or not to institute suit for the deficiency against himself and his mother, nor did he call to John's attention the fact that the giving of the bond and mortgage was in law a voidable transaction, at the election of John, nor that without John's consent the trustees had no legal right to accept the security for trust funds.
As said in Todd v. Exeter Land Co., 104 N.J. Eq. 431:
"The principle of equitable estoppel proceeds upon the ground that he who has been silent as to his alleged rights when he ought in good faith to have spoken, shall not be heard to speak when he ought to be silent. A person is not permitted to deny a state of things which by his culpable silence he has led another to believe existed and who has acted accordingly upon that belief."
If Richard had made a full disclosure to John, as above indicated, then John would be held to either an acceptance or rejection of the mortgage, and had he remained silent, his silence would have been culpable, but there was certainly no duty on John that would raise an equitable estoppel against him on the information which Richard says he gave John as to the mortgage transaction.
But the defendants say that John has, starting with the year 1928, received from the defendants annual statements showing the amounts of income received and the amounts expended and that John has regularly received checks for the difference.
In 1928 the income account showed, under date of May 5th, "Received from Richard McAllister, Jr., interest due on $100,000 trust from 9-28-27 to 1-3-28, $1,583.74." Under date of July 5th interest on mortgage 1, Atlantic City, New *Page 416 
Jersey, $3,000, and in each succeeding year, in the accounts rendered by the trustees to John the same reference is made to "interest on mortgage 1, Atlantic City, N.J." There is nothing in these accounts which calls John's attention to the details of the investment other than that Richard, Jr., paid over to the Provident Life and Trust Company the first $3,000 interest payment and that subsequently someone paid interest on mortgage "1 on Atlantic City property." There is nothing that brings John's attention to the vital things he should have been acquainted with, i.e., that Richard, Jr., was one of the obligors and mortgagors and that he, therefore, would be acting in a dual capacity and that in the event of default, determine the question of whether to foreclose or not, and if so, and a deficiency resulted, bring suit on the deficiency.
The situation is somewhat analogous to that in St. Paul TrustCo. v. Strong, 85 Minn. 1; 88 N.W. Rep. 256, where the court said (at p. 259):
"During the years 1891, 1892, 1893 and 1894 the company forwarded annual statements to the beneficiaries, with letters of transmittal, inclosing checks. These statements were transcripts of book entries, and it is very evident that the recipients were thereby informed that investments had been made, and interest collected, credited, and thereby distributed, and of the condition of the company's account with the estate. But these transcripts did not advise the beneficiaries that the notes and mortgages were originally the private property of the trustee, and had been transferred and assigned to itself as trustee. All of the facts surrounding these transactions were material for the information of the beneficiaries, if they were to be bound by them in any manner. By simply failing to object to these investments when receiving interest derived therefrom, it is difficult to see how they can be said to have ratified the plaintiff's acts, or how they can be estopped and precluded from questioning them when the real facts are first brought to their notice. To establish a ratification, the facts involved must not only be proven, but it must be shown that it was made with a full knowledge of all the material *Page 417 
particulars and circumstances. Imperfect and incomplete information is not sufficient, and certainly there was nothing in the accounts, or in the letters, or in the checks for interest, which informed the beneficiaries of the real conditions." See, also, Hodge v. Macintosh, 248 Mass. 181; 143 N.E. Rep. 43.
It is also said by the defendants that the mortgage given by Richard to the trustees as aforesaid had been on record since January of 1928 and that if John had inspected the record it would have been made known to him that Richard was the mortgagor and that the mortgage was created for the benefit of Richard McAllister, John Casey and the Provident Trust Company, as trustees for John McAllister under the will of Richard McAllister, deceased.
There was no duty on the part of the cestui que trust to investigate the record at Mays Landing. Scheel v. Jacobson,112 N.J. Eq. 265; Giehrach v. Rupp, Ibid. 296.
In passing, it may be well to note that John explicitly denies the testimony of Richard in which Richard claims to have advised John as to the creation of the mortgage in question, and it is also well to note that there is nothing in the case that shows that John's wife, Beulah, the other complainant, the life beneficiary in the remainder, ever had any information as to the character of the investment.
Defendants also say that the complainants are guilty of laches and therefore are estopped now to question the validity of the investment. Up until April, 1935, John received his interest regularly. He had no cause for complaint and had a right to assume that his trustees were properly administering the trust. As soon as his income stopped he consulted counsel and interviews were had with the trustees which, proving unsatisfactory, were followed by the filing of this bill of complaint. John's delay has not in any way affected Richard or his co-trustees adversely, unless it be said that it will be difficult to refinance the trust at this time, and for that John is not responsible. There has been no loss of testimony to the defendants nor are they prejudiced in any way in their defense. *Page 418 
The result reached by the court is that the trustees of the estate of Richard McAllister, deceased, had no right to use the $100,000 bond and mortgage given by Richard McAllister and his mother to himself and his co-trustees and that the complainant is entitled to relief.
Points 2, 3, 4 and 5 relied upon by complainants are as follows: (2) The property upon which the mortgage was taken being insufficiently productive to produce the mortgage interest, over and above the taxes, was not a proper investment either to make or retain. (3) The investment by the trustees of the whole of thecorpus of the trust in one mortgage on one tract of land was not a proper investment. (4) The investment was plainly made and retained, not for the benefit of the trust, but for the benefit of Richard McAllister and the residuary estate. (5) A state of mutual ill-feeling exists between the trustees and John, by reason of alleged fault of trustees, so that a continuation of the trustees in office would be detrimental.
It might appear to be unnecessary to decide points other than the first, inasmuch as a result on that point is to declare the investment illegal on that ground, but complainants also seek a decree removing the trustees by reason of their alleged dereliction, as set forth in all five points relied upon by them, so that I will discuss the matters alleged in their entirety, in order to determine whether the trustees should be removed.
In the first place, it is not for every failure on the part of the trustees that they will be removed.
In Holcomb v. Coryell, 12 N.J. Eq. 289 (at p. 297), the court said:
"It is a well settled rule in equity, that if the acts or omissions of the trustee be such as to endanger the trust property, or to show a want of honesty or a want of a proper capacity to execute the duties, or a want of reasonable fidelity, equity will remove the trustee."
In Lathrop v. Smalley's Executors, 23 N.J. Eq. 192, the court said:
"A trustee will not be removed for every violation of duty. For acts done in bad faith, or that have diminished or endangered *Page 419 
the trust fund without bad faith, it is the duty of the court to remove him."
Another rule as laid down in May v. May, 167 U.S. 310, and cited with approval by Vice-Chancellor Stevens in Lister v.Weeks, 60 N.J. Eq. 215 (at p. 228), is:
"The power of a court of equity to remove a trustee and to substitute another in his place is incidental to its paramount duty to see that trusts are properly executed, and may properly be exercised whenever such a state of mutual ill-feeling, growing out of his behavior, exists between the trustees, or between the trustee in question and the beneficiaries, that his continuance in office would be detrimental to the execution of the trust, even if for no other reason than that human infirmity would prevent the co-trustees or the beneficiaries from working in harmony with him, and although the charges of misconduct against him are either not made out or are greatly exaggerated."
But the court, in Lister v. Weeks, proceeds, after the above situation:
"Of course, friction or hostility between trustee and beneficiaries is not of itself a reason for the removal of the trustee; but where that hostility has arisen out of the misbehavior of the trustee it may be. Trustees exist for the benefit of those to whom the creator of the trust has given the trust estate."
This qualification of the rule, as above laid down, has met with general approval. See annotation, McDonald v. O'Donnell,8 Fed. Rep. 2d 792; 45 A.L.R. 328 (at p. 331).
Taking up the question of ill-feeling between John and Richard, any ill-feeling that may have existed between John and his brother, if John's testimony be accepted as true, had existed at least since the death of the father, and yet John, during all that time, notwithstanding the existing ill-will, testified that he has never at any time inquired from Richard or from any of the co-trustees the nature of the instrument making up his trust estate, and that all he has ever asked for from the trustees were checks for income. If this be so, John has evinced complete confidence in the integrity and *Page 420 
business ability of the three trustees and no dissatisfaction, by reason of ill-will or otherwise.
Furthermore, it clearly appears from the evidence that Richard does not have any feeling of hostility toward John but, on the contrary, he has been very tolerant and brotherly. It also further appears that John's habits of drinking are such, or have been such, as to have been the cause of the ill-feeling which John has for Richard and that the fault is not, therefore, Richard's, and it is quite apparent that John's discovery of the manner in which the co-trustees had set up John's estate did not cause the ill-feeling which, according to John, was of long standing.
In my opinion, had not Richard determined to withhold John's income in order that John could be induced to reform, this litigation would never have been instituted, and it was this effort of Richard's which embittered John. I am not passing on the legal right of Richard to resort to this means of protecting John, but do hold that Richard's motives were altruistic, so that, unless there are additional reasons, the trustees should not be removed merely on account of the discord between John and Richard.
In Starr v. Wiley, 89 N.J. Eq. 79, the court said:
"A trustee will not be removed for discord existing between him and the cestui que trust, unless it arose out of his behavior."
In answering the remaining questions we must have in mind that the testator provided in the fourth paragraph of a codicil to his will, subdivision (b):
"The investment and re-investment of the principal constituting the Trusts created by this my will shall be limited to bonds secured by first mortgage upon real estate, the amount of the bond and mortgage not to exceed at the making of the loan or investment, fifty per centum of the estimated worth of the real estate covered by the mortgage."
The requirements of the testator that the investment in real estate be on a first mortgage, in an amount not exceeding fifty per cent. of the estimated worth thereof was fully met *Page 421 
by the trustees, i.e., the only evidence in the case shows that the value of the real estate described in the mortgage in question was $230,000.
But it is said that bad faith is evidenced because the entire trust was in one bond and mortgage, instead of being diversified, and that the improvements on the property, as the trustees knew or should have known, could not produce sufficient income to pay interest and carrying charges.
No one will gainsay that diversity of investment of trust funds is, generally speaking, the wise course to follow, but standing alone, failure so to do will not justify a finding of bad faith. From the evidence, it appears that it would have been impossible to have set up the four trusts by the use of the personal estate and that to have attempted to do so would not only have failed but that a sale thereof in order to convert it into cash would have been to sacrifice that part of the estate.
There were stocks in the trustees' hands of the estimated value of $375,000 and upwards and bonds and mortgages to the extent of $112,000 and upwards. Of the stocks, some were marketable and some were not; some of the nonmarketable stocks had value, even if there was no sale for them, and to have forced a sale would have been to sacrifice these values. For instance, the Marine Trust Company stock, valued at $117,000, could not have been readily disposed of. $100,000 in McAllister Coal Company was not marketable. It was a closed corporation. The same condition existed with relation to $90,500 of stock in R. McAllister, Incorporated. $10,000 in the South Jersey Title and Finance Company and $10,000 in Equitable Trust Company stock was not marketable without sacrifice, while other stocks could not have been sold under any circumstances.
In addition to the personalty, testator left real estate, in addition to his dwelling property, and in setting up the other three trusts, this is what the trustees did:
For the $100,000 trust of one of the daughters they took a first mortgage on property at Bellevue avenue and the beach in Atlantic City. This was an asset of the estate. *Page 422 
For the $100,000 trust of another daughter they took a mortgage on property at Rhode Island avenue and the beach, also in Atlantic City.
For the $50,000 trust in favor of the grandchildren they took a $30,000 mortgage on property on Mediterranean avenue in Atlantic City, occupied by the McAllister Coal Company, and $20,000 in cash.
Under all the circumstances, I do not find that the investment set up by the trustees for John or for the other beneficiaries, were made and retained for the benefit of Richard McAllister and the residuary estate and not for the benefit of the trust.
Viewing all of the acts of the trustees complained of, I am unable to conclude that they acted in any respect in bad faith, nor do I find that their acts as complained of have endangered the trust estate or that there has been any dishonesty or want of proper capacity on the part of the trustees to execute the duty of the trust.
In Lathrop v. Smally's Executors, supra, the trustee had retained the trust funds and mingled them with his own, in a mistaken idea that he was within his rights, and the court refused to remove him, for reasons similar to those above. The trustees in the instant case are financially responsible and it must be said in their behalf that under the terms of the will they had a right to invest in mortgages and also had a right to use "property" of the decedent in setting up the trusts created by the will, and in taking the mortgage in question they undoubtedly considered that it covered an interest which decedent had in his lifetime in the mortgaged premises.
The decree will necessarily require that the trustees set up a new investment to secure John's $100,000 trust and they, the trustees, will be permitted, of course, to take over unto themselves the mortgage which has heretofore constituted the trust investment. If the trustees comply with the order of the court it cannot be said that the trust estate has been in anywise impaired by the action of the trustees in originally setting up as the investment for the trust the mortgage in question *Page 423 
and the financial responsibility of the trustees is such that compliance with the decree must necessarily follow, with the result that the trust investment will have weathered the entire period of the depression and still be intact, a result which, in all probability, would not have ensued had the trustees seen fit to use decedent's personal estate, either as to the stocks included therein or as to stocks, c., which they might have purchased.
The prayer that the trustees be removed will be denied.
Since the filing of the bill of complaint the trustees have accounted, to which account complainant has filed exceptions (1) to deductions by the trustees for taxes on personal property levied in Pennsylvania.
Under the terms of a codicil to the will, testator directed:
"I will and direct that my corporate trustee, the Provident Life and Trust Company, shall have the custody and care of the monies, securities and investments which may constitute the trusts under my will."
In pursuance of this direction, the personalty is kept in Philadelphia and is subject to personal property tax. Section 1 of the act of June 17th, 1913, Pa. P.L. p. 507. These taxes have been paid annually and during all the years John has acquiesced in the deduction thereof, as clearly appears from the annual statements received by John each year.
(2) The trustees have annually deducted their commissions, to which complainant excepts.
The codicil aforesaid provides that —
"Commissions shall be paid to the Provident Life and Trust Company at the rate of 3% per annum upon income from the trust created by this my will and my individual trustees shall receive 2% upon such income."
It was under this authority that the trustees had each year deducted a total of five per cent. and John consented to that deduction each year, with full knowledge of the charge therefor.
It is true that even where testator provides the compensation of trustees they are not permitted to collect excepting on *Page 424 
an accounting and order of a court of competent jurisdiction but when, as here, testator has provided specific compensation and the cestui has consented to the deduction thereof by the trustee out of income collected over a period of years, the trustees will not be surcharged unless they, by their acts, have become disentitled to any commission, and I do not find that they have, by their acts, disentitled themselves to the commissions provided for under the will.
(3) During the course of this litigation the trustees have paid to their counsel certain sums for their services and the trustees have prayed allowance in their final accounting for these payments. Complainant excepts thereto.
The payments were made by the trustees with a full understanding between counsel for the respective parties and the court that such payments should be advanced by the trustees, subject to the final order of the court as to the propriety of such payments. Inasmuch as this litigation was necessitated by the acceptance of the bond and mortgage aforesaid and that action has been declared to be illegal, it would seem to the court that the trustees must themselves bear the burden of counsel fees and the exception is sustained.
(4) The trustees have charged interest in a small amount on over-drafts, which were occasioned solely through the use of trust funds for the payment of counsel fees and, inasmuch as the counsel fees have not been allowed, the exception to the over-drafts will be sustained.
The account of the trustees, corrected as above allowed and approved.
Counsel for complainant is entitled to costs and a reasonable counsel fee, to be paid by the trustees.
 A decree will be advised in accordance herewith. *Page 425