ROBERT P. LISTER et al.

*v.*

WILLIAM R. WEEKS.

[Filed May 17th, 1900.]

1. Trustees exist for the benefit of those to whom the creator of the trust has given the trust estate. Their acts may exhibit such a lack of reasonable fidelity, short of dishonesty, as to warrant their removal by a court of equity.

---

Lister *v.* Weeks.

---

2. Upon the proofs exhibited in this case—*Held,* also, that the trustee had been guilty of such misconduct in the management of his trust as to warrant his removal, especially in view of the ill-feeling engendered thereby between him and his *cestuis que trust.*

---

On pleadings and proofs.

*Mr. Chauncey G. Parker, Mr. Robert H. McCarter* and *Mr. Richard V. Lindabury,* for the complainants.

*Mr. Charles L. Corbin,* for the defendant.

STEVENS, V. C.

This is a bill to remove defendant from his position as trustee under the will of Edwin Lister.

Edwin Lister died on May 18th, 1898. He left personal estate to the amount of $1,200,000, together with a large amount of real estate. By his will, dated November 29th, 1895, after giving a few small legacies and making a provision for his wife, he gave all the residue of his estate to his son, Robert P. Lister, and his daughter, Esther G. Selby, share and share alike, and he appointed his son, Robert, and his son-in-law, William B. Selby, his executors. On the 7th of May, 1898, he made a codicil, in which he appointed William R. Weeks his executor, made other provision for his wife and ordered as follows:

"My interest in the Lister Agricultural Chemical Works I direct shall remain in the hands of my executor, in trust, for the benefit of my children, during their lifetime and after their death to go to their children at their majority."

The interest thus bequeathed consisted of three thousand five hundred and forty-four shares of stock in the Lister works, and was a controlling interest, the total issue of stock being six thousand shares. It was inventoried by Lister's executor at $200 a share, and was actually sold for a little more than that.

At the time of his death Edwin Lister was the president and treasurer of the company. Its vice-president and assistant treasurer was his son-in-law, Selby. His son, Robert Lister, was one of its five directors and the other directors were Edwin Lister,

William B. Selby, John F. Kehoe and P. H. Martin.  From the date of Lister's death (May 18th, 1898) until the annual meeting of the stockholders, on January 25th, 1899, Selby acted as president.  On that day William R. Weeks was elected a director in place of Edwin Lister and the other members of the old board were re-elected.  At the suggestion of Mr. Weeks the stockholders made a revision of the by-laws, which he had prepared. The only alteration material to the present inquiry was the addition of a new section known as article 111, section 2, as follows:

"The directors (for cause) may suspend any officer or director, except the president, and may elect some one in the place of the person so suspended."

Immediately after the stockholders' meeting was adjourned a directors' meeting was convened, at which Weeks was elected president; Selby, vice-president and treasurer; Lancaster, secretary, and John F. Kehoe, general manager.  The salaries of these officials were also fixed.  Mr. Weeks, a few days before, had, by letter, requested the secretary to inform him what salary Edwin Lister had received.  He was told that it was $8,000.  At the meeting he produced a written list of salaries to be voted. To himself he assigned $10,000, to Selby $4,000 and to Kehoe $6,000.   This was an increase of $1,000 each for Selby and Kehoe and of $2,000 for the president.  These sums were voted, but Selby having protested against any increase in the president's salary, Weeks, a day or two after, instructed the secretary to change his salary on the minutes from $10,000 to $8,000.  At the same meeting an annual dividend of fifteen per cent.—the same in amount that had been declared for several years previously—was voted.  This dividend, according to Mr. Weeks' statement (and his statement is corroborated by the evidence), consisted of five per cent. of earnings, five per cent. of savings (*i. e.,* reduction in expenditures) and five per cent. of accumulated surplus.  Three days after, Mr. Weeks sent checks to Robert Lister and Mrs. Selby for their share of the dividend.  Each check was for $25,420.47, and consisted of the entire fifteen per cent., less what he calls "my commission of 5% to wit,

$1,337.92." In paying the money he made no deduction, in favor of his infant *cestuis·que trust,* either of the accumulated surplus entering into the dividend, or of the sum earned between January, 1898, and the date of testator's death (May 18th).

Prior to the annual meeting Weeks and Selby had been notified of an effort to effect a combination of the various fertilizer works in different parts of the country, and options at $199.50 had been solicited by Hobbs & Gifford, a firm of New York lawyers, who acted as promoters of the undertaking. Neither Robert Lister nor Mr. Selby was willing to sell at this price.

Although there appears to have been considerable conversation between Hobbs & Gifford on the one side, and Weeks, Selby and Lister on the other, no progress was made toward a definite conclusion. Mr. and Mrs. Selby and Robert Lister all testify that Mr. Weeks said to them that he would not undertake to sell under any circumstances without consulting them. Mr. Weeks denies this, but I am inclined to think that his memory is at fault in this respect. At the directors' meeting held in March, 1899, Lister and Selby were authorized to go to Philadelphia and Boston to get views of other manufacturers about the proposed combination. On their return they did not give, and Weeks did not ask for, their opinion about it. After that nothing of moment occurred until May 17th, except that Weeks says, and Selby denies, that he (Weeks) told them at the April meeting of the directors that it would be suicidal not to go into the combination, and that if they would not take the matter up, he would, on his own discretion.

On May 17th, Weeks testifies that he went to Gifford's office, in response to a call over the telephone, and that Gifford then offered to buy the stock at the option price; the same price that had been proposed to the minority stockholders—$199.50; that he (Weeks) insisted upon a higher price, and that finally $200 a share was conceded; that he asked for time—over night—to consider it, and that on the next morning he telephoned an acceptance; that Gifford met him in New York on that morning and gave him a check, and that he asked him if he (Weeks) would not favor him (Gifford) by taking the certificates to the factory, as he understood there was to be a directors' meeting

Lister *v.* Weeks.

that day, and have them transferred. I think it highly probable that the question of what should be done in case Mr. Selby would not, as treasurer, make the transfer, was discussed either then or on the day previous, and a plan of action agreed upon. The meeting of the directors took place in the afternoon of May 18th. After the regular business was disposed of, Mr. Weeks announced that he had sold the stock, and said that he had received a check for it and had caused a new certificate to be made to the American Agricultural Chemical Company, and then requested the treasurer to sign it. Up to this time Mr. Weeks had not communicated the sale to any member of the Lister family, notwithstanding his promise not to undertake to sell without consulting them. Mr. Selby, on being asked to sign, said it was a very serious matter, and that he wanted time to consult counsel. Weeks refused to give any time, saying that he had made arrangement to deliver the certificate that night. After some parley, Weeks said: "You know, as treasurer of the company, the consequence of refusing to perform your duty." Selby replied that he could not sign. Then Weeks asked Robert Lister, as assistant treasurer to sign, and Lister replied that he would rather cut off his right arm than sign. Weeks thereupon drew a resolution to the effect that Selby be suspended and that the office of treasurer be declared vacant for his refusal to perform the duties of his office, in the matter of the signing of the certificate. This resolution was offered by Martin and seconded by Kehoe. It was carried by the three votes of Martin, Kehoe and Weeks against the two votes of Selby and Lister. Then it was resolved that Edward Lancaster, the secretary, be elected treasurer to fill the vacancy. Immediately upon his election Lancaster signed the certificate. This occurred Thursday afternoon. On Saturday, a bill filed by Mrs. Selby and Robert Lister was presented to me asking that the sale be enjoined on the ground, among other things, that the trustee was without power to sell. On May 31st, an order to show cause was made and a hearing had on the answer of Weeks and the affidavits of the American Agricultural Chemical Company. The result was that on June 8th, the preliminary restraint was continued, but it was provided by the order that nothing therein contained should restrain the

American Agricultural Chemical Company from returning the stock, and Weeks from receiving it. The parties concerned acquiesced in the view that I took that Weeks had no power to sell, unless authorized by the court, upon a case made showing the *corpus* of the fund to be in danger. They agreed to a re-transfer of the stock and a return of the check.

Not long after new negotiations were commenced. The unwillingness of Selby and Lister to sell appears to have been chiefly based upon the inadequacy of the price offered. It is perfectly apparent that the Lister Company possessed a most valuable plant and most substantial assets. The total assets, as reported by the auditor, amounted to $1,755,691.13, and these included United States bonds to the amount of $233,000, which had been kept in reserve by the company for several years, and cash in bank to the amount of $166,000. The debts were insignificant. It is undoubtedly true that on some of the assets, notably the building, tools and machinery, and perhaps the land, too high a valuation had been placed, but after making every reasonable allowance, it is probably true that $1,200,000 could have been realized, even if the company had then been wound up. Certainly the offer of $200 per share, to be paid in cash, was not a high price.

After the court had decided that it was Mr. Lister's intention that the stock should be kept intact for the benefit of his children and grandchildren, and that he could not sell, unless he was authorized to do so, it was obviously Mr. Weeks' duty to put the company in the strongest possible position, so that if it became necessary to enter into a competition with the new company, it might compete under favorable circumstances; and so that if it became necessary to sell, he might obtain the highest possible price for the stock. So far from doing this he did precisely the reverse.

The most valuable contract which the company possessed was that which it had made yearly with the American Sugar Refining Company to furnish bone-black, and which had brought it $800,000 per annum. The officers of the Lister company to whom in former years had been entrusted the duty of securing this contract were the president and the manager, Kehoe.

Weeks had heard that the proposed combination would endeavor to deprive them of this contract in the winter or early spring of 1899. He testified that he stated what he had so heard at the February or March meeting of the board. He further testified that it was Mr. Kehoe's business to renew it, and that, "in a general way," he then spoke to him about it as he had spoken to Selby; that afterwards, finding that Selby (not Kehoe) had neglected to do anything, he specially requested Kehoe to do what he could. Kehoe (although Mr. Weeks' witness) denies this and says moreover that he (Kehoe) never made any effort whatever to get it. The reason why he did not is obvious. From the first he had been a zealous advocate of the new combination. The promoters of the new enterprise had asked him to go into it prior to the annual meeting of January, 1899. He had, at that meeting, on behalf of the promoters, solicited and obtained the signatures and options of all the stockholders except Selby, Selby's father and Lister. He had declared it to be his opinion that it was best for all concerned to go into it. He says that he had resolved to go into it at the time he was elected general manager of the Lister company in January, 1899. He was elected a member of the executive committee of the new combination immediately after its organization, in the latter part of May, 1899, and at the directors' meeting of the Lister company, held on June 15th, he tendered his resignation as manager because of the conflict of duty—a resignation which was not accepted. The rival concern did not obtain the contract until August 1st. Now it cannot be doubted that Weeks must have known of Kehoe's relations to the new company as early as May, if not earlier, and yet with this knowledge, and although he was president, on a salary of $8,000, presumably taken as compensation for performing the duties of that office, he did not make any effort other than that which I have mentioned to secure it. His only excuse is that it wasn't his place to do it and that it would have been futile to do it. Neither of these excuses are borne out by the evidence.

Knowing at least as early as May that Kehoe's interests were adverse to those of the Lister company, it was his place, and his place alone, to do it. It comes with ill grace from him to say

that Selby, whom he had in the most arbitrary fashion, turned out of office because of his refusal to do an illegal act, should have attended to it. And there is little to indicate that if he had made a real effort, his exertions would not have been successful. He was at least bound to try—at least bound to make such effort as any man of ordinary business ability and prudence would have made had the stock been his own. I think it must be obvious to anyone who reads the testimony with attention that the true reason why he made no effort, either before or after May 18th, was that he was determined, with the co-operation of the promoters of the combination, and notwithstanding what had been decided by this court, to effect a sale. I am unable to explain his action subsequent to May 18th on any other hypothesis.

As I have already said, negotiations were renewed after June 8th. Mr. Gifford says he was first approached by Robert Lister and his adviser, Frank M. McDermit. It is apparent that, notwithstanding the declarations made on behalf of the American Agricultural Chemical Company that they did not care for the Lister concern, it was a matter of considerable importance to them to secure it. With the exception of a single company in Philadelphia (which did not enter the combination), there was no concern east of Detroit capable of producing enough bone-black to meet the requirement of the sugar refining company. If the bone-black were brought from Detroit the freight charges would materially affect the profits. So it is not surprising that Messrs. Hobbs & Gifford offered, by way of advance on their previous offer, common stock of the new company of the par value of $150,000. This stock (which they say was their own) has sold for from $35 to $50 per share since it has been put upon the market. Both Mrs. Selby and Robert Lister still held off. At the request of two of the minority stockholders, who all favored the sale (possibly on the ground that they had little confidence in the new management), Mr. Weeks called a special stockholders' meeting for July 26th. The members state that it was called "to consider the question of disposing of and dividing among the stockholders the proceeds of the sale of certain United States government bonds the property of the company."

What occurred at this meeting is stated in the minutes as follows:

"The chairman (Weeks) reported that the sale of the stock to the American Agricultural Chemical Company was nearly completed. Mr. Shaw, the representative of the London & Chicago Contract Corporation L'td of Chicago, Illinois, suggested that thirty minutes more be allowed to complete the sale. Mr. McCarter, representing Esther G. Selby, stated that owing to some minor technicalities the sale could not be completed that day and he moved to adjourn, subject to the call of another meeting within 48 hours notice. Mr. E. C. Hay seconded the motion and it was carried unanimously."

Still Selby and Lister refused to sign the necessary papers, and on August 15th another meeting was held "for the same purpose as the adjourned meeting of July 26th." At this meeting, according to the minutes, Messrs. Hill, Hay, Gifford, Shaw and Condit spoke in favor of the distribution of the United States government bonds, after which R. M. Shaw, who does not appear to have been a stockholder, but who spoke for the combination, offered a resolution to the effect that the treasurer, at the discretion and with the approval of the president, sell the United States bonds and divide the proceeds among the stockholders in proportion to their several holdings. Mr. Weeks was requested by Mr. McCarter, on behalf of Selby, and by Mr. Parker, on behalf of Mr. Lister, to vote against the resolution, but he voted in its favor. He says he did so because as a discretion was left with him as president, he did not think it right to call the stockholders together again to consider the question. He says, however, that he then stated it to be his opinion that the bonds ought not to be retained.

Then Mr. Shaw offered another resolution, viz.:

"That a committee composed of E. C. Hay, Geo. R. Hill and W. C. Childs be appointed for the purpose of taking advice of counsel as to whether or not the company may be legally dissolved forthwith and as to how soon it may be done and as to what steps may be necessary to accomplish such dissolution."

This was also, against the protest of Mr. Selby and Mr. Parker, voted for by Mr. Weeks, on the ground, as he testifies, that it was only to get information, which could do no harm, and that he

thought it was only fair to the stockholders that a request of that kind should be carried.

These resolutions, so obviously passed to compel Mrs. Selby and Mr. Lister to sign the contract, had the desired effect. They both signed. A supplemental bill was filed setting out the new facts. The bill was answered by the parties in interest, including the infant children, who were represented by Judge Dodd as their guardian *pendente lite.* The case came again before me on the 21st day of December. Evidence was taken, and, after argument, I advised that the sale should be approved. I did this, not because the evidence convinced me that, under able management, the Lister company could not have stood against its new competitor, or because I thought that the price obtained was the highest possible price that could have been secured under other circumstances, but because I feared that with a president incapable of practically directing the affairs of the company, and with the only officers capable of managing it in the new combination, with no one else suggested as a competent head, and with the principal source of profit, viz., the bone-black contract, then gone, the interest of the infants was endangered, and ought to be secured in accordance with what must have been the paramount intention of the testator.

I have thus far narrated the facts necessary to a comprehension of Mr. Weeks' position, and will now discuss as briefly as possible the character of those acts which are said to have been breaches of trust sufficiently grave to warrant his removal. Before doing so, however, I will notice an objection taken *in limine.* It is said that the acts done were done by him in his character of executor and not of trustee. As to this I need only say that I think he was acting as trustee from the time he assumed the presidency. He amended the by-laws, as he says, to give himself greater power of control. By his own vote he became president—a position of permanency. In his speech to the stockholders of the company, made just before his election, he says: "You are all well aware of the death of the president of these works and the *trust* which has devolved upon me by his will to care for his interest in these works." He assumed the presidency, therefore, in order to perform a trust. As the estate

was free from debt, he only did his duty in so doing. A few days after he became president he paid over the first dividend to his *cestuis que trust* on the same theory. I have no doubt that the court has, under these circumstances, the power to deal with him as trustee.

The first act complained of is his voting to himself a salary for which, it is said, he knew he neither would nor could render an equivalent in service. Primarily, this was a question for the company as such, but as he thus took an indirect profit from his trusteeship, and as his act tended to reduce the dividends or surplus, it cannot be altogether disregarded here. Judged by the service that, in the light of his subsequent conduct, he expected to render, and that he did in fact render, it was excessive. The services actually rendered during the year were (1) to attend two out of the three stockholders' meetings and eleven out of the fifteen directors' meetings; (2) to consult with Mr. Kehoe (Kehoe says not oftener than once a month) in reference to economies, and to authorize such economies as Mr. Kehoe proposed; (3) to visit, on one or two occasions, the works. He could hardly have intended to do more than this when he voted for the salary, for he had no practical knowledge of the business. He was, as he testifies, a lawyer, in large practice, with offices in Newark and New York, where he spent all his time. His willingness to make an undue profit out of the trusteeship is further illustrated by the fact that he voted himself $2,000 more than Mr. Lister, a practical man of great experience, had received, and only gave it up in consequence of the opposition of Mr. Selby.

The second act complained of, on behalf of his infant *cestuis que trust,* is that, in paying the first dividend to the life tenants, he neither reserved for them so much thereof as represented accumulated surplus, nor so much as was earned between January, 1898, and the date of Lister's death. In failing to reserve the earnings of the stock between the last-mentioned dates, he violated the rule laid down in *Lang* v. *Lang, 12 Dick. Ch. Rep. 325,* but that rule is of such recent promulgation (November 18th, 1898) that he could hardly be said to have committed a breach of trust, involving any moral delinquency, by disregarding it. The rule had been supposed to be otherwise. The same

cannot be said of his conduct in paying over that part of the dividend which represented accumulated surplus. He distinctly says in his testimony that he knew at the time that this dividend consisted, in part, of such surplus, and that he ought to have reserved it. This is his evidence:

"*Q.* Did you or not understand that under the law the children were entitled to have set apart for them as principal a certain portion of that dividend?

"*A.* That was what I thought at the time, even though I did not look up the question.

"*Q.* Well, now thinking that way, how did you justify yourself in paying the entire amount over to the life tenants?

"*A.* Because they insisted upon it."

In another part of his testimony he says that it was his judgment that it was not right, and that he told them so. It seems to me that conduct of this sort in a trustee—a lawyer of experience—who was thus easily persuaded, against his known duty, to sacrifice the interests of his infant *cestuis que trust,* gives some indication of unfitness to discharge the responsibilities here cast upon him.

Another indication, though not so important, of his desire to profit by this trust is to be found in his letter accompanying the check for the dividend sent to the life tenants. He deducts from the full amount of each check what he calls "my commission of 5%, to wit, $1,337.92." Two thousand six hundred and seventy-five dollars and eighty-four cents is rather liberal compensation for the work of drawing two checks. It may be that for his services, taken as a whole, after a considerable period of duty well performed, the orphans court would have allowed five per cent., though such an allowance, by that court, is not, so far as my experience goes, the usual allowance; but he had no legal right to take it *then.* He testifies distinctly that he put it, not in his account as executor, but in his personal account.

I come now to what appears to me to be a much more serious breach of trust, and one, too, which seems to indicate an inability on the part of Mr. Weeks to comprehend the true position which a trustee ought to occupy with respect to his *cestuis que trust.* I refer to his attempt to dispose of the stock in May, 1898. The

trust was intended, primarily, for the benefit of the life tenants. These tenants were Mrs. Selby and Robert Lister, both under forty years of age.   Mrs. Selby's husband represented her interest.   He had been for many years vice-president and assistant treasurer.   He is a man of character and intelligence.   He was intimately acquainted with the company's affairs.   One would have supposed that, under these circumstances, a trustee, new to the business, willing to sell, in opposition to what seemed to be the intention of the testator as expressed in the codicil, would have been especially anxious to obtain the advice and concurrence of Mr. Selby.   So far from doing so, he appears to have thought that he would best perform his duty by taking counsel with the attorneys of the promoters; of keeping all knowledge of the sale from both Selby and Lister until it was so far consummated as to be incapable of being disturbed, and of even contriving with those attorneys a plan of action whereby Selby might be removed from the treasurership in case he refused to sign the certificate.   What he did was to prepare and carry through a resolution removing Mr. Selby for not doing what the court subsequently declared to be illegal, without giving that gentleman, in a matter of such life-long importance to him, even a few hours in which to consult counsel.

His failure to take any effective steps to secure the bone contract relates, primarily, to his management of the Lister company.   It is argued that it may demonstrate his incapacity to properly perform the duties of president of a corporation engaged in the manufacture of fertilizers, but does not show that he would not take proper care of the money derived from the sale of the stock.   This is, perhaps, to some extent, true.   His inaction appears, however, to illustrate, in a somewhat striking way, his conception of what is required of a trustee in the performance of a duty, which he has voluntarily assumed, and for which he has voted to himself a very liberal compensation.   It cannot be said that he made an effort which was strenuous, though misdirected, and which failed by reason of his inexperience.   He made no effort at all.

His conduct, after the decree enjoining the sale, cannot be justified.   If he conscientiously believed that a sale of the stock

was in the interest of the trust, he ought, at least, to have so acted as to have, in every legitimate way, enhanced its value, so that, if its sale were approved by the court, it would have realized the highest price. A new combination was being formed, which was, avowedly, to become the chief competitor of the Lister company. Now, certainly, it was a great advantage to this company, in the threatened competition, to be so strong financially : practically, not to owe a dollar, and to have a reserve of $233,000 invested in United States bonds. This advantage Weeks was willing, at the instance of the competitor and against the protest of his *cestuis que trust,* to throw away.

He voted for and, by his own vote, carried a resolution authorizing the sale of the bonds, saying, when he voted, that it was his opinion that the bonds ought not to be retained; and he also voted for another resolution looking to the appointment of a committee to consider whether the company might not be legally dissolved forthwith.

I am of opinion that these various acts, deliberately done and covering a period of over six months, show such lack of reasonable fidelity on the part of the trustee as to warrant his removal. *Holcomb* v. *Coryell, 1 Beas. 289.*

There is another ground upon which the trustee should be removed. In *May* v. *May, 167 U. S. 310,* Mr. Justice Gray uses the following language :

"The power of a court of equity to remove a trustee and to substitute another in his place is incidental to its paramount duty to see that trusts are properly executed, and may properly be exercised whenever such a state of mutual ill-feeling, *growing out of his behavior,* exists between the trustees, or between the trustee in question and the beneficiaries, that his continuance in office would be detrimental to the execution of the trust, even if for no other reason than that human infirmity would prevent the co-trustees or the beneficiaries from working in harmony with him, and although charges of misconduct against him are either not made out or are greatly exaggerated."

Of course, friction or hostility between trustee and beneficiaries is not of itself a reason for the removal of the trustee; but where that hostility has arisen out of the misbehavior of the ·

trustee it may be.  Trustees exist for the benefit of those to whom the creator of the trust has given the trust estate.  *Letterstedt* v. *Broers, 9 App. Cas. 386.*

Tested by this rule, Mr. Weeks cannot be retained in the trusteeship.  It is perfectly apparent that a feeling of bitter hostility has been generated in the life tenants, who, as being younger, are likely to survive their trustee.  This hostility has no other cause than his own ill-conceived acts.  All confidence is at an end.  The trustee and the life tenants cannot work in harmony.  It seems to be clear, therefore, that the execution of the trust should be committed to others.