It is expedient in the preparation of this memorandum of my conclusions to summarize the introductory facts, omitting, *Page 222 
I acknowledge, references to some incidental circumstances which have nonetheless received consideration. On March 19th, 1940, one William T. Taylor died possessed of an estate of the inventory value of $452,908.62. The major portion of his resources consisted of 385 of the 400 shares of the capital stock of the Taylor Provision Company. The stock of the decedent was appraised initially for administration purposes at $375,375.
By his last will executed on February 25th, 1935, and probated on April 3d 1940, the testator nominated the defendants Trenton Trust Company and Harry C. Errion executors and also his trustees to whom he bequeathed his shares of the stock in trust for the beneficial enjoyment of the complainants.
Prior to his death, the testator had officiated as the president and treasurer of the company. Mr. Errion had been in the employ of the company continuously since 1924 and had been elevated to the office of vice-president in July, 1933, and in the following year he also attained the office of assistant treasurer. Those offices he retained until shortly after the death of the testator. It is conceded that the shares of stock qualifying Mr. Errion and the representative of the Trust Company to participate in the corporate management were in reality owned by Mr. Taylor.
The directors of the company had been three in number, Mr. Taylor, Mr. Errion, and Mr. Petty; the last named was incidentally the trust officer of the Trenton Trust Company. On March 25th, 1940, six days after the testator's death, a meeting of the board of directors was held, on which occasion the death of Mr. Taylor was chronicled, and pursuant to authority conferred by the by-laws, Mr. Waugh, an employee of the company, was selected to supply the vacancy in the membership of the board. Moreover, Mr. Errion was thereupon by the vote of the appointed trustees chosen president and treasurer to succeed Mr. Taylor.
It was at the meeting of the directors to which I have alluded that the salary to be paid to Mr. Errion as president and treasurer became a subject of consideration. His annual salary had been $5,200. Should he now receive an increase? *Page 223 
Thus, Mr. Errion was promptly led into an alcove of temptation. The indubitable fact is that the directors, of whom the future testamentary trustees constituted the majority, resolved that Mr. Errion should be paid for his services the same salary theretofore established by the board for Mr. Taylor but intrinsically determined by Mr. Taylor for himself. The annual salary payable to Mr. Taylor, in truth the owner of the enterprise, had been $10,400. Mr. Errion has since continued to collect annually from the company the sum of $10,400 as salary.
Upon the probate of the testator's will the defendants assumed their fiduciary duties as executors and testamentary trustees, and true also, Mr. Errion and a representative of the Trust Company have continued to constitute the majority of the board of directors of the Provision Company.
The acts of the trustees which the complainants most emphatically impugn may likewise be briefly divulged. The specified acts are characterized by the complainants as engorgements. The defendants despite their obligations as trustees have in their capacities as directors of the company authorized the payment of bonuses to themselves from the receipts of the company.
It is frankly confessed that in addition to a salary of $10,400, Mr. Errion has obtained the following amounts pursuant to resolutions adopted by the trustee-directors on the dates here mentioned: July 15th, 1940, $6,200; December 12th, 1940, $5,000; June 16th, 1941, $5,000; December 15th, 1941, $5,000; June 15th, 1942, $2,500. During those years a bonus, so denominated, of $250 was paid under like authority to the representative of the Trust Company who served as a director of the Provision Company.
In September, 1942, the executors-trustees presented their account, which was assailed by exceptions. One exception is said to accumulate greater significance in view of the alleged misfeasance of the defendants in awarding bonuses to themselves. The company at the death of the testator owned bonds and securities which on December 31st, 1939, were appraised at $295,038.31. The complainants desired that *Page 224 
this investment account should be preserved and sustained. The complainants informed the Trust Company by letter:
"As beneficiaries of said estate, we wish to go on record as objecting to any such sale of said stock. Also the proceeds from any securities constituting the investments held by the Taylor Provision Co. that have matured or will mature, be invested in new securities immediately subject to our approval and not used for the normal operations of the business. When any change takes place in the status of the investment portfolio of the Taylor Provision Co., we wish to be advised prior to the actual or contemplated change."
The defendants, however, sold some of the securities, some matured, and the proceeds were diverted to "working capital," out of which disbursements including the bonuses were paid. On March 31st, 1941, the investment account had been reduced to $219,624.44. The insistence is that but for the expenditures made to the executors-trustees, there was no reasonable need of diverting the proceeds of such securities from the investment account.
Another criticism. On April 15th, 1940, a regular dividend was declared. It is asserted that in the distribution of that dividend the defendants again exhibited their lack of caution and diligence in the discharge of their duties. The dividend was the first declared after the testator's death. The preceding regular dividend had been declared on December 15th, 1939. The amount of the dividend of April 15th, 1940, payable to the decedent's estate was $9,625. The defendants failed to apportion it between the life tenants and the remaindermen. See Lang v. Lang'sExecutor, 57 N.J. Eq. 325; 41 Atl. Rep. 705; Hagedorn v. Arens,106 N.J. Eq. 377; 150 Atl. Rep. 4; Union County Trust Co. v.Gray, 110 N.J. Eq. 270; 159 Atl. Rep. 625; City Bank Farmers'Trust Co. v. McCarter, 111 N.J. Eq. 315; 116 Atl. Rep. 274;affirmed, 114 N.J. Eq. 46; 168 Atl. Rep. 286; Graves v. Graves,115 N.J. Eq. 547; 171 Atl. Rep. 681; Bankers Trust Company of NewYork v. Lobdell, 116 N.J. Eq. 363; 173 Atl. Rep. 918;130 A.L.R. 492. The entire dividend was paid to the life beneficiaries. It is proposed that only $2,147.73 of the dividend was properly payable to them. *Page 225 
On November 6th, 1942, the complainants petitioned the Orphans Court of Mercer County for a decree abrogating the authority of the defendants to longer serve as executors and trustees. Upon request and without objection this court has assumed jurisdiction of the administration of the trust.
The removal of the defendants from their fiduciary offices as trustees may be regarded as the primary object of the present bill. It is desirable to first resolve that issue, leaving for further hearing and consideration the specific exceptions to the accounts as such and the propriety of surcharges.
This case sustains the persistent apprehension that in fiduciary situations external temptations are likely to generate internal avidity. A preclusive rule of law exemplifies the wisdom of our public policy in suppressing and subverting all such risks. There is perhaps no rule more firmly imbedded in our legal and equitable concepts than that which positively forbids every person who acts in a representative capacity from manipulating his authority for his own personal gain to the disadvantage of his principal. Indeed, a person assuming such a relationship is not permitted to place himself amid opportunities that tempt him to take advantage of his principal or cestui que trust. Of course, it is one thing to be tempted and another thing to succumb.
This salutary rule of law designed to brace moral nature was endorsed by our Court of Errors and Appeals in Staats v.Bergen (1867), 17 N.J. Eq. 554, and has expression in the lengthy procession of decisions that have ensued. A few vivid quotations from some reported cases will be more serviceable here than a mobilization of all the available citations.
Recognized by Chief-Justice Green in Mulford v. Bowen,9 N.J. Eq. 797, the inexorable character of the rule is concisely declared in Staats v. Bergen, supra (at p. 559): "The rule, to be efficacious, must be general, and the law implies, therefore, that in all cases of trusts, such opportunities may exist, and, consequently, the prohibition is universal, that he may not do anything which, while it is an advantage to himself, is, or may be, a loss to the trust estate. So jealous is the law upon this point that a trustee may not put himself in a position in which to be honest must be a strain upon *Page 226 
him. The general rule, therefore, applies, not merely in those cases in which the confidence is absolutely betrayed, but when the circumstances are such that there was a temptation to violate it."
In Meinhard v. Salmon, 249 N.Y. 458; 164 N.E. Rep. 545, Mr. Justice Cardozo, then a member of the Court of Appeals of New York, made the following comment: "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the `disintegrating erosion' of particular exceptions. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."
Again in Wendt v. Fischer, 243 N.Y. 439; 154 N.E. Rep. 303,
Mr. Justice Cardozo remarked: "Only by this uncompromising rigidity has the rule of undivided loyalty been maintained against disintegrating erosion."
In Shanley's Estate v. Fidelity Union Trust Co., 108 N.J. Eq. 564; 157 Atl. Rep. 160, Vice-Chancellor Backes remarked: "They are our trustee and the law demands of trustees the utmost fidelity. It does not tolerate personal dealing with the trust estate nor permit the making of a penny's profit. The rule is grounded in sound morals and is reflected in the supplicating words of the Lord's prayer, `Lead us not into temptation.' This is not an imputation upon the motives of the directorate of our trustee, but a simple statement of an elemental doctrine of the obligations of trustees."
Vice-Chancellor Sooy in his opinion in the case of In reBender, 122 N.J. Eq. 192; 192 Atl. Rep. 718; affirmed, 123 N.J. Eq. 171; 196 Atl. Rep. 677, approved the text of Professor Pomeroy: *Page 227 
"This rule is of wide application, and extends to every variety of circumstances. It rests upon the principle that as long as the confidential relation lasts the trustee or other fiduciary owes an undivided duty to his beneficiary, and cannot place himself in any other position which would subject him to conflicting duties, or expose him to the temptation of acting contrary to the best interests of his original cestui que trust. The rule applies alike to agents, partners, guardians, executors and administrators, directors and managing officers of corporations, as well as to technical trustees. The most important phase of this rule is that which forbids trustees and all other fiduciaries from dealing in their own behalf with respect to matters involved in the trust, and this prohibition operates irrespectively of the good faith or bad faith of such dealing. It is therefore a gross violation of his duty for any trustee or director, acting in his fiduciary capacity, to enter into any contract, with himself connected with the trust or its management; such a contract is voidable, and may be defeated or set aside at the suit of the beneficiary." 3 Pom. Eq. Jur. 2473§ 1077.
The rule has merited the approbation of the highest court of our nation: "It is a well settled rule that a trustee can make no profit out of his trust. The rule in such cases springs from his duty to protect the interests of the estate, and not to permit his personal interest to in anywise conflict with his duty in that respect. The intention is to provide against any possible selfish interest exercising an influence which can interfere with the faithful discharge of the duty which is owing in a fiduciary capacity." Magruder v. Drury, 235 U.S. 106, 119.
Very recently Mr. Justice Heher in presenting the decision of the Court of Errors and Appeals in Camden Trust Co. v. Cramer,136 N.J. Eq. 261; 40 Atl. Rep. 2d 601, stated: "It is both sound law and good morals that a fiduciary may not in case of conflict, subordinate the cestui's interest to his own. Undivided loyalty is of the very essence of the relationship. The trustee is under a peremptory duty of complete loyalty and fidelity to the cestui. Self interest can never be the determinative. He cannot serve two masters in an area of service involving divergent and discrepant interests."
The conclusion is inescapable that these defendants have disregarded the settled principle of law that was not only applicable to their obligations as trustees, but circumscribed as well their duties as directors of the company. A bonus is *Page 228 
something given in addition to what is ordinarily earned by or strictly due to the recipient. In bestowing by their concordant action the extra remunerations upon Mr. Errion without testamentary authority or the consent of the complainants or the sanction of the court, the defendants were assuredly guilty of misfeasance. Should they be expelled and the execution of the trust committed to others?
The superior consideration is the welfare of the trust. The only claim trustees can have to their authoritative existence is their service on behalf of those upon whom the settlor has bestowed the beneficial enjoyment of the trust estate. To protect trusts against jeopardy, courts of equity are invested with the power to remove trustees for derelictions or breaches of duty. The power to remove trustees, especially those who were selected by the creator of the trust, must be discreetly and justifiably exercised. Not every mistake, neglect, or inaccuracy of conduct of a trustee will warrant such an incisive remedy. The acts or omissions ordinarily inducing removal are, broadly stated, those that endanger the trust property or exhibit a lack of honesty, or of proper capacity, or of reasonable fidelity. 2 Story Eq. Jur.,§ 1289; Holcomb v. Coryell, 12 N.J. Eq. 289. The discretionary action of the court depends upon the circumstances of the given case.
One can rarely conjecture what purpose the retention of old memorials may ultimately serve. Among the exhibits is a letter written by Mr. Errion to Mr. Taylor on January 13th, 1939, to which I ascribe imposing significance because in the effort to discover motives and incentives it is more impressive to read what the accused person has stated in his own handwriting than it is to read what others say about him. The letter must be reproduced in full:
"1/13/39.
Dear Mr. Taylor
I trust the enclosed outline of our profits for 1938 appear quite satisfactory to you.
If you think I have accomplished what seemed to me at first an insurmountable task, that is, restoring the company to its previous status as a money maker, I want you to consider doing a favor for me. That of course depends upon yourself.
As you know, in the distant future the profits of the business will *Page 229 
go to the ones you named in your will as beneficiaries. As you also know they know how to spend. I sometimes think they will be dissatisfied and want more, (although they will get every penny of profit). Naturally they may get more if they protest against the amount I get. I dont want any more than I am now getting, but I dont want them to have any grounds for protesting at what I am getting.
Under the circumstances I would esteem it quite a testimonial of your regard for my services if you would write to me personally and state that you have high regard for my services and desire that the present arrangement we are now working under shall continue on after you are gone.
You see Mr. Taylor after you are gone it is up to me and Mr. Petty to decide on compensation and it is embarrassing for Mr. Petty as well as to myself to vote me compensation to the same extent as at present unless I have a letter from you to show it was your intentions it should be.
So Mr. Taylor if you think I merit this consideration and desire I be saved embarrassment and perhaps discord, write me such a letter.
As always,
 Your obedient servant CHOLLY. P.S. Please destroy this."
It is at once evident that Mr. Errion knew of the will the testator had executed; apprehended that the beneficiaries (the widow and daughter of the testator) would protest against even a continuance of his then existing compensation and was conscious of the embarrassment both he and Mr. Petty would encounter in continuing his compensation at the then existing figure. Mr. Taylor was then in ill health. He neither destroyed the letter as requested, nor did he supply the desired testimonial. He immediately delivered the letter to Mrs. Taylor. He died fourteen months later.
It was therefore in that patent state of mind that Mr. Errion, as previously noted, called a meeting of the directors six days after the testator's death at which he caused himself to be elected president of the company and doubled his previous salary of $5,200 only to thereafter multiply it by four during the years of 1940, 1941, by means of bonuses, and only ceased such indulgences when his conduct was attacked by the complainants. Mr. Taylor had been inactive in the business of the company for a period of at least two years immediately preceding his death, and there is no evidence that Mr. Taylor's demise cast upon Mr. Errion any appreciable *Page 230 
enlargement of his duties in the management of the enterprise. If so, the appropriate resort would be to submit the matter to the court for instructions. Shanley v. Fidelity Union Trust Co.,supra.
And then, a copy of a written report addressed to the directors of the company by Mr. Errion on December 15th, 1941, catches attention. On that date a bonus of $5,000 was awarded to Mr. Errion, and yet in his report he states:
"The need for increased working capital is quite apparent. Besides pork, prices of all supplies have risen sharply. Accumulation of necessary supplies beyond immediate needs is imperative to avoid stoppage. Deliveries are slow and promises are not kept. Working capital can only be secured by withholding dividends; borrowing, liquidating investments; or withholding from reinvestment maturing securities. The need may arise to liquidate certain investments to meet the obligations of the estate through purchase of our own stock."
There are some reported cases comparable in factual occurrences. In our own jurisdiction, several features of the present case resemble those of Lister v. Weeks, 60 N.J. Eq. 215; 46 Atl. Rep. 558; affirmed, 61 N.J. Eq. 675;47 Atl. Rep. 1132, in which Vice-Chancellor Stevens scored similar acts of the trustee: "It is said that the acts done were done by him in his character of executor and not of trustee. As to this I need only say that I think he was acting as trustee from the time he assumed the presidency. He amended the by-laws, as he says, to give himself greater power of control. By his own vote he became president — a position of permanency. In his speech to the stockholders of the company, made just before his election, he says: `You are all well aware of the death of the president of these works and the trust which has devolved upon me by his will to care for his interest in these works.' He assumed the presidency, therefore, in order to perform a trust. As the estate was free from debt, he only did his duty in so doing. A few days after he became president he paid over the first dividend to hiscestui que trust on the same theory. I have no doubt that the court has, under these circumstances, the power to deal with him as trustee. *Page 231 
"The first act complained of is his voting to himself a salary for which, it is said, he knew he neither would nor could render an equivalent in service. Primarily, this was a question for the company as such, but as he thus took an indirect profit from his trusteeship, and as his act tended to reduce the dividends or surplus, it cannot be altogether disregarded here. * * *
"The second act complained of, on behalf of his infant cestuisque trust, is that, in paying the first dividend to the life tenants, he neither reserved for them so much thereof as represented accumulated surplus, nor so much as was earned between January, 1898, and the date of Lister's death."
In a like category are some cases in our neighboring State of New York from which pertinent quotations can be educed.
In Pyle v. Pyle, 137 App. Div. 568; 122 N.Y.S. 256;affirmed, 199 N.Y. 538; 92 N.E. Rep. 1099: "There is, however, one ground specified which, if true, not only presents a serious question, but I think, under all the facts and circumstances, entitles the plaintiff to have the appellant removed. It is a fundamental rule relating to the acts of a testamentary trustee that he must not only act for the benefit of the trust estate, but also in such a way as not to gain any advantage, directly or indirectly, except such as the law specifically gives him, for himself. He owes an undivided duty to his beneficiary, and he must not, under any circumstances, place himself in a position whereby his personal interest will come in conflict with the interest of his cestui que trust. Pom. Eq. Jur., §§ 1075-1077;Chaplin on Express Trusts Powers, § 193; Matter of Hirsch, No.1, supra (116 App. Div. 367). The purpose sought to be secured by this rule of law is to require a trustee to assume a position where his every act is above suspicion and the trust estate, and it alone, can receive not only his best services, but his unbiased and uninfluenced judgment. When he has acted otherwise, or when he has placed himself in such a position that his personal interest has or may come in conflict with his interest as trustee, then, so far as I have been able to discover, the court never hesitates to remove him. Under such circumstances the court does not stop to inquire whether the transactions *Page 232 
complained of were fair or unfair. It stops the inquiry when the relation is disclosed. Munson v. S.C. C.R.R. Co., 103 N.Y. 58.
The appellant personally owns one-half the capital stock of the corporation, from which he is receiving a salary of $25,000 a year as its president. He and the plaintiff as trustees of his brother's estate own the other half. The disagreement which has arisen between the two trustees, in effect, disfranchises their stock, the plaintiff insisting on voting it one way and he the other, the effect of which is to give him the actual control of the corporation by virtue of the stock which he owns personally. By accepting a salary as president of the corporation he has placed himself in a position whereby his personal interest may or has come directly in conflict with and to a certain extent antagonistic to his interest as trustee. It is not necessary to determine that he has acted in bad faith or received from the corporation a sum in excess of what he would have been legally entitled to if he had been selected as president of the corporation had he not been a trustee of an estate holding one-half of the capital stock. One-half of the salary paid to him diminishes to that extent what would otherwise be paid to the beneficiaries of the trust which he represents, and to this extent at least he is not in a position to so act that his personal interest does not come in conflict with his interest as trustee. He ought not to have placed himself in such position and having done so ought not to be permitted to act as trustee."
In re Grossman's Estate, 283 N.Y.S. 323, 328; affirmed,294 N YS. 942: "It has been further shown that the executor, Walter A. Fribourg, has effected his election as president of Julius Grossman, Inc., a corporation in which the estate held a substantial block of stock. In that office he is in receipt of an annual salary of $5,200. Thereby he placed himself in a position where his personal interest and the interest of the beneficiaries over whom he was trustee were antagonistic. He was not connected with the company before the death of the testator. In such situations the courts have held that the adequacy or reasonableness of the salary paid is not material. The law, solicitous of undivided loyalty to the beneficiaries, prohibits the assumption of antagonistic interests. While not *Page 233 
urged here as a specific ground of removal of the respondents, it has been held in two decisions of the Appellate Division, First Department, that the mere acceptance by the fiduciary of the corporate office upon a salaried basis is sufficient reason for removal."
In re Hirsch Estate, 116 App. Div. 367; 101 N.Y.S. 893, 899;affirmed, 188 N.Y. 584; 81 N.E. Rep. 1165: "It is not necessary to determine that the appellant acted in bad faith or received from the corporation a sum in excess of what he would have been legally entitled to had he been selected as president and counsel for the company by the stockholders owning stock in their own right. He placed himself in a position where his personal interest and the interest of the beneficiaries for whom he was trustee were to a certain extent antagonistic. We may assume that the amounts that he received from the company were not in excess of the value of the services rendered by him to the company, but every dollar that was paid out by the company for salaries and legal services depreciated the amount available for distribution among the stockholders. When, therefore, he was elected president of the company by directors whose election he as trustee controlled and allowed them to vote him a large salary as such president, and also allowed them to authorize the payment to him of bills for the legal services which he rendered to the company, he subjected himself to the criticism of using the position that the ownership of the stock held by him in trust gave him to secure to himself this salary and legal employment which resulted in personal advantage to himself. These acts of the appellant finally brought him into active antagonism with the beneficiaries of the trust estate. Their relations as disclosed by the evidence are such that it is quite clear that the affairs of the trust cannot be advantageously administered by the two trustees, and under such circumstances we think that the surrogate was amply justified in arriving at the conclusion that he did — that the interest of the trust required that the appellant should be removed as trustee."
It is intimated that some of our own decisions display a more moderate attitude toward such impolicies. Cf. McAllister v. *Page 234 McAllister, 120 N.J. Eq. 407; 184 Atl. Rep. 723; affirmed,121 N.J. Eq. 264; 190 Atl. Rep. 52; Rothenberg v. FranklinWashington Trust Co., 127 N.J. Eq. 406; 13 Atl. Rep. 2d667; modified, 129 N.J. Eq. 361; 19 Atl. Rep. 2d 640.
Those cases are perceptibly distinguishable from the case at hand.
The Errion letter of January 13th, 1939, was probably vexatious to the wife and daughter of the testator. The discovery of his acquisitive propensities has undoubtedly accentuated an unfriendliness between the beneficiaries and the trustee. True, hostility between trustee and beneficiaries is not an imperative reason for the removal of the trustee. May v. May,167 U.S. 310. Yet the estrangement absorbs greater materiality where it arises from the misbehavior of the trustee.
The explanations submitted by the trustees in the endeavor to exculpate themselves have been duly considered. It is said that Mr. Taylor indulged in the practice of allowing bonuses to his employees particularly at the Christmas season. Although his annual recommendations are said to be appended to the minutes of the meetings of the directors, the minutes have not been offered in evidence. Nevertheless, in such instances it is notable that Mr. Taylor was the donor and the employee was the donee. It is not difficult to comprehend that a decidedly different footing eventuated when Mr. Errion became both the donor and the donee. There is no grace in a gift that sticks to the donor's own fingers.
It is also apparent that Mr. Errion highly esteemed the conviction of the Research Institute, whose opinion he embodied as follows in his annual report of 1941:
"To a greater degree than ever before, concerns this year are resorting to year-end bonuses as a means of encouraging essential employees and reducing tax liability. Tax-payers facing the prospect of over one-half their profits going for federal income and excess profits taxes need little additional reason for distributing to employees part of what otherwise would be income. If additional reasons are needed, they can be found in labor unrest and an ever-increasing competition for trained workers."
While the Trust Company profited little, if any, from the improper acts, and while its financial liability as between trustees *Page 235 
may be secondary in character (Purchase v. Atlantic SafeDeposit, c., Co., 81 N.J. Eq. 344; 87 Atl. Rep. 444; affirmed,83 N.J. Eq. 353; 91 Atl. Rep. 1070; Hill v. Hill, 79 N.J. Eq. 521,545; 82 Atl. Rep. 338), yet it cannot be logically acquitted of all culpability. The representative, now deceased, who acted for the Trust Company was an attorney and counsellor-at-law, having been admitted to the bar in 1894. He was a respected citizen and a reputable lawyer, but I cannot infer that he was not conversant with the familiar principles of law that reprehended the transactions in which he actively participated.
The ambition of most men to achieve a competence is quite naturally motivated by the associated desire to shelter beloved dependents from the pressures of financial needs. It is not pursued with a view of prospering executors or trustees. Moreover, the faith of every testator that the judicial authorities, if required, will intervene to protect the interests of his beneficiaries and effectuate his wishes is undoubtedly an expectation of inestimable consolation. Here the widow, daughter, and grandson of the testator implore this court to lend them its aid.
In such an undertaking my deliberations have traversed two avenues of thought, the one leading to the retrospections of the past, the other to the reasonable contemplations of the future. The redress to which the complainants may be fairly and equitably entitled for the improprieties of the past can be attained in the accounting. Does future relief call for the removal of one or both of the trustees?
Obviously Mr. Errion in both thought and action has permitted his self-interest to dominate his regard for his fiduciary duties. In all the circumstances, both past and prospective, it is my judgment that to relieve him of his authority as trustee is amply justified and will promote the welfare of the trust.
Whether the Trust Company should also be displaced is more equivocal. While its representative failed to dedicate to his task that degree of vigilance and courageous fidelity to the interests of the trust that might well have been expected, yet the inferences of premeditated self-advantage displayed *Page 236 
by Mr. Errion in his letter are not imputable to the bank or its representative. Mr. Errion contrived for his own personal profit. The bank acquiesced. However, looking toward the future I am unable to attach to the Trust Company those apprehensions applicable to Mr. Errion. To the contrary it appears that the bank is now represented by another trust officer whose capability is not impugned. The bank over a span of years has acquired a useful knowledge of the investments and financial affairs of the testator and of his company. It has financial resources which afford security against its omissions of duty. That factor has frequently been accorded materiality. Lathrop v. Smalley,supra; McAllister v. McAllister, supra; Babbitt v. FidelityTrust Co., 72 N.J. Eq. 745 (at p. 760); 66 Atl. Rep. 1076; Inre Johnston, 127 N.J. Eq. 576; 14 Atl. Rep. 2d 469. The Trust Company will not now be removed as trustee, but if any dereliction of duty continues, the present denial to terminate its authority must be understood to be without prejudice to a future application. Hereafter the trustees should recognize the prudence of submitting their precarious problems of policy to the court for approval.