**In the Matter of the Estate of Elmer Szantay, Deceased. Marie Szantay Konopka, as Guardian of Rita Jean Szantay and Ruth Joan Szantay, Minors, Kathryn Elizabeth Szantay and Margaret Eileen Szantay, Petitioners-Appellees, v. The Northern Trust Company, Individually and as Executor of the Estate of Elmer Szantay, Deceased, Respondent-Appellant.**

Gen. No. 51,106.

First District, Third Division.

February 23, 1968.

Bell, Boyd, Lloyd, Haddad & Burns, of Chicago (Charles T. Martin and J. William Hayton, of counsel), for appellant.

McKenna, Scovel and Gannon, of Chicago (Joseph D. Gannon and Philip J. McKenna, of counsel), for appellees.

MR. JUSTICE SCHWARTZ delivered the opinion of the court.

This is an appeal from an order of the Probate Division of the Circuit Court surcharging the executor of the estate of Elmer Szantay in the sum of $25,000 for the allegedly improper adoption of a profit-sharing plan for the employees of Sandee Manufacturing Company. Sandee's stock is wholly owned by the estate and is its principal asset. The suit was brought by Marie Szantay Konopka, as guardian of Rita Jean Szantay and Ruth Joan Szantay, minor children of the testator, who together with two adult children were the principal beneficiaries. She

charges that an unreasonable portion of the profits was distributed to employees under the plan, that the employees in fact designated their own compensation and that they did so in a manner contrary to the interests of the beneficiaries. The two adult children were also originally named as petitioners, but they do not appear to have continued in the litigation. Petitioner was given leave to file an amended petition in this court pursuant to Supreme Court Rule 362 (Ill Rev Stats, c 110A, § 362 (1967)), and the sole party petitioner named in the amended petition was Marie Szantay Konopka as guardian aforesaid. Respondent made a motion to file an amended answer, which motion was taken with the case and is now allowed.

Sandee Manufacturing Company was organized by the deceased Elmer Szantay who was president and owner of all its stock. On April 1, 1962, he and James Clemens, the sales manager, were killed in a plane accident. By his will the Northern Trust Company was named executor and trustee and was authorized to continue the business pursuant to the following provision:

> "it is my wish that my Executor continue the operation of any business or businesses I may own at the time of my decease, using the same personnel then employed, as far as feasible, if in the opinion of said Executor it is or they are earning a fair return on the investment. . . ."

Pursuant to the express wish of the deceased, the executor continued the business, using the personnel then employed as far as possible. It contends that it earned an outstanding return on the investment after paying all expenses including salaries and profit-sharing incentive bonuses; that the total compensation paid including salary and incentive bonuses to fifteen employees was reasonable and that the executor received nothing by the

adoption of the plan and should not be penalized for its stewardship.

At the time of Szantay's death, Sandee had a net worth of $137,999. In addition it had life insurance policies covering both Szantay and Clemens in the sum of $297,-387.94. The net worth of the company as of July 31, 1962, was shown as $460,603.64. The insurance proceeds were held by the company largely in the form of federal government securities and cash. The amounts thereof held in the years 1962 to 1965, inclusive, were as follows:

| Year | 7/31/62 | 7/31/63 | 7/31/64 | 7/31/65 |
|---|---|---|---|---|
| Cash— | $100,468.25 | $106,811.14 | $ 80,394 | $ 28,751 |
| U. S. Government Obligations At Cost— | 125,000 | 224,262 | 298,783 | 298,297 |

By July 31, 1965, the holding in government securities slightly exceeded the original amount of the insurance proceeds. The interest on these securities was not subject to the bonus plan.

It appears that the sudden deaths of Szantay and Clemens caused great concern among the employees of the company. They urged the executor to continue the business and to adopt an incentive plan. The executor decided there was a good prospect of earning a fair return in excess of the amount which could be earned by selling the business and investing the proceeds. Having reached that decision, the executor after consulting the successor-president and others decided that an incentive plan was necessary to maintain the prosperity of the company and the continued employment and vigor of its staff. Negotiations with employees followed and a plan was agreed upon. The agreement defined that portion of the company's income subject to the bonus plan as follows:

"Net profits shall be construed as being before income taxes and shall be the amount as determined by the company's public accountants for audit purposes and reporting to stockholders. Nonrecurring or non-operating profits or losses, such as capital gains or losses, proceeds from life insurance policies, interest or gains on investments and other unusual items shall be eliminated."

The first $25,000 of operating income, as hereinbefore defined, was to be reserved to the stockholders. Thereafter, fifty percent was to be set aside for the incentive fund. As proceeds from life insurance, interest or gains on investments were excluded from the plan, this gave added assurance that a substantial sum would be available for dividends. The plan further provided that the board of directors would select an executive compensation committee to consist of the president and two directors. The committee was to select participants other than those specifically set forth in the plan and to determine the amount of bonus to be paid to each participant. The actions of the committee were subject to unanimous approval by the board of directors. Distribution of the bonus fund was subject to the limitation that no participant was to receive more than fifty percent of his basic salary out of the bonuses derived from the first $100,000 of operating income earned by the company in any year. If however the company succeeded in earning more than $100,000 in any year, fifty percent of the profit would go to the bonus plan, to be distributed to the employees without regard to their basic salaries.

The bonuses given employees under the plan for the three years 1963, 1964 and 1965 were respectively $69,176.63, $87,707.33 and $36,648.76. The top three executives received total compensation as shown below:

| Fiscal Year | 7/31/63 | 7/31/64 | 7/31/65 |
|---|---|---|---|
| Robert Wehrheim, President | $30,212 | $36,111 | $22,429 |
| Charles McGuinness, Superintendent | 19,155 | 19,279 | 14,489 |
| Virgil Rathbone, Sales Manager | 17,549 | 20,475 | 14,465 |

In support of its position that the incentive plan was necessary and desirable, the executor argues that the business is one in which special attention must be given to preserving customer-employee relationships and that the death of its two top men was especially disturbing to a business which depended on technical skill in production and on customer cooperation. The company produces extruded plastic products on a custom-job basis, the principal product being plastic light diffuser panels used as components in fluorescent lighting fixtures. Upon receiving an order, Sandee prepares a die and produces a sample of the item which is then submitted to the customer for approval. The company seeks approval of the sample product while the machinery is still operating so that it may thereby save setup time and increase the utility of its equipment. Close customer contact secures expeditious approval and is a significant factor in reducing production costs. For these reasons the executor concluded that some plan was required to keep the key men engaged in the operation of the business and in its opinion the only feasible arrangement was the profit-sharing plan.

As to the total compensation paid employees coming under the plan, two expert witnesses testified that the total compensations paid by Sandee in 1963, 1964 and 1965 were low. G. M. Baccash, manufacturing vice-president of Lind Plastic Products, Inc., testified that Sandee's salaries were too low to attract qualified people. Elmer E.

Mills, a consultant in the plastic industry, testified that the company's salaries were low and that the total compensation, including bonuses, paid to employees was not out of line with industry standards. There was no testimony on behalf of the petitioner on this issue.

Net profits of $56,651, $66,126 and $47,196 were earned for the estate in three successive years, after the payment of all bonuses. Based on a net worth of $460,000 (including funds derived from insurance), the return was in the range of 10% to 14% per year. During the three years the incentive plan was in effect the company after paying all compensation had an average income from operations of $93,332 (before taxes). That was a marked increase over the average income from operations during the period 1959–1962, which was $36,880.

Petitioner contends that earnings for 1962, the year of the testator's death, were substantially higher than the succeeding years after adoption of the bonus plan. Financial statements in the record show that a special tax credit amounting to $48,000 was largely responsible for the showing in 1962.

Petitioner charges that two officers of the company served conflicting interests since as members of the executive compensation committee they could determine their own bonuses. It appears however that the actions of the committee were subject to the unanimous approval of the board of directors and that the board had full authority to fix salaries, even for services of its own members. Ill Rev Stats, c 32, § 157.33 (1967).

Petitioner also alleges that the executor wrongfully concealed the adoption of the plan from her and from the beneficiaries of the trust. Concealment does not appear to have been the basis for the surcharge, and the receipts and disbursements of the company were ultimately disclosed pursuant to a court order entered July 28, 1964. The executor explained that Marie Szantay Konopka was divorced from decedent five months prior to his death;

that custody of the children was given to decedent following the divorce and that petitioner was not appointed guardian of the minor beneficiaries until after the bonus plan was adopted. The petitioner was not herself a beneficiary and the executor was under no duty to apprise her of such business judgments. The executor after conferring with M. G. Kaufman, attorney for the estate, formed the opinion that the petitioner was not experienced in business and though she had been a nominal director of the company prior to the divorce, she had no special knowledge of the plastic extrusion industry. In addition the executor was advised that the petitioner might oppose the plan and jeopardize the continued operation of the business. It further appears that prospects for cordial relations between the petitioner and the attorney for the estate were rather bleak as he had represented Szantay in the divorce action.

■■ The real issue here is whether a surcharge may be imposed against an executor as a penalty for its business judgment where no loss is shown to have been incurred by the estate and no ulterior advantage derived by the executor. An executor may continue the operation of a testator's business when expressly authorized to do so by will and that direction will be respected by the courts unless it should appear to be highly disadvantageous to the estate. Where discretion is granted to a trustee, his decisions will be conclusive in the absence of negligence or fraud. Moore v. McFall, 263 Ill 596, 105 NE 723; See, Bogert, Trusts, § 571, p 168 (2nd ed, 1960). When a business is continued by a trustee, the profits become part of the estate or trust for which the business is being carried on and losses are a charge on the estate or trust property. The trustee cannot be charged if it has used prudence in carrying on the business. Bogert, Trusts, § 754 (2nd ed, 1960).

Petitioner cites Hatfield v. First Nat. Bank, 317 Ill App 169, 46 NE2d 94. There the court held that the

chancellor ruled correctly in refusing to surcharge for losses occasioned by the estate when there was no showing of negligence. The rule as there stated is that a trustee receiving stock in a testator's estate under direction to continue the investment will not in the absence of negligence, fraud or other improper conduct become liable for losses resulting from an honest mistake in judgment in the retention of the stock.

Petitioner also cites In re Estate of Busby, 288 Ill App 500, 6 NE2d 451, in support of her contention that the executor should be surcharged. In that case the testator died shortly before the great depression of the 1930's, leaving a large investment portfolio. Many of the securities were pledged as collateral for loans and as the stock market declined, the estate's equity in the shares diminished. The court held that the executor should not have continued to hold such speculative investments and that this caused a loss to the estate for which the executor was liable. In the instant case there was no loss, but on the contrary the business earned a substantial profit for the estate.

■ Petitioner further cites Taylor v. Errion, 137 NJ Eq 221, 44 A2d 356 (1945) in support of her contention that the adoption of the bonus plan was a breach of trust. In that case the testator owned substantially all the stock of the Taylor Provision Company. Errion, an employee of the company, was designated coexecutor and cotrustee along with the Trenton Trust Company. Following the death of the testator, Errion continued to manage the business and although his duties remained the same, the directors doubled his salary and paid him large bonuses. Certain securities owned by the company were liquidated against the express wish of the beneficiaries in order to provide more working capital and to pay the bonuses voted to Errion. The chancellor held that Errion had violated his fiduciary duty and removed him as trustee. The court did not remove the trust company from its position as

cotrustee nor did it impose a surcharge. In no sense does Taylor v. Errion constitute authority for the surcharge imposed in the instant case.

Petitioner contends that the profit would have been much larger but for the adoption of the bonus plan. The fact remains that the net income of the company produced a fair return on the corporate assets. The apprehension that if the company prospers, an excessive return will be distributed to the employees must be subjected to the assumption that the executor-trustee, having all the stock, has control of the situation and can and should exercise due caution in the administration of the plan. There is ample evidence to support the finding that a less generous bonus plan would have resulted in numerous resignations, that replacements could not have been hired at the company's existing wage levels and that the obsolete machinery it owned would have been sold at a loss. Wehrheim who was elected president appears to have been Szantay's logical successor. He intimated he would resign unless the bonus plan was adopted. Counsel for petitioner argues that this revealed lack of loyalty to the company. It was nevertheless a fact with which the executor had to deal, as Wehrheim was under no contractual obligation to stay. A bonus plan appeared to the executor to be the solution. A business decision such as was here involved cannot be the basis for a surcharge.

The order of surcharge is reversed.

Order reversed.

DEMPSEY, P. J. and SULLIVAN, J., concur.